768 F.2d 1558
 In the Matter of the Complaint of HERCULES CARRIERS, INC.,
etc., Plaintiff- Appellant,
v.
CLAIMANT STATE OF FLORIDA, DEPARTMENT OF TRANSPORTATION, et
al., Defendants- Appellees.
In the Matter of the Complaint of HERCULES CARRIERS, INC.,
etc., Cross- Appellee,
v.
CLAIMANT STATE OF FLORIDA, DEPARTMENT OF TRANSPORTATION, et
al., Cross- Appellant.
 Nos. 82-5733, 83-3242 and 83-3591.
 United States Court of Appeals,
Eleventh Circuit.
 Aug. 26, 1985.
 
 Dewey R. Villareal, Jr., Carl R. Nelson, Tampa, Fla., J.M. Morse, III, Tallahassee, Fla., for plaintiff-appellant.
 
 
 1
 G. Morton Good, Miami, Fla., James A. Martin, Jr., Clearwater, Fla., Richard G. Rumrell, Jacksonville, Fla., Charles P. Schropp, Raymond T. Elligett, David G. Hanlon, Tampa, Fla., for State Dept. of Transp.
 
 
 2
 Richard F. Ralph, Miami, Fla., for Greyhound Bus Lines, Inc.
 
 
 3
 David V. Hutchinson, Civ. Div., Torts Branch, U.S. Dept. of Justice, Washington, D.C., for U.S.
 
 
 4
 Roger A. Vaughan, Wagner, Cunningham, Vaughan & McLaughlin, P.A., Tampa, Fla., for all Death & Personal Injury Claimants.
 
 
 5
 Appeals from the United States District Court for the Middle District of Florida.
 
 
 6
 Before JOHNSON and CLARK, Circuit Judges, and LYNNE*, District Judge.
 
 CLARK, Circuit Judge:
 
 7
 This is a consolidated appeal involving three cases arising out of the allision of the SUMMIT VENTURE with the Sunshine Skyway Bridge near the mouth of Tampa Bay on May 9, 1980. In No. 82-5733, the district court granted the claimants' motion for partial summary judgment on the issue of exoneration. Hercules has appealed this order but as discussed below the ruling of the district court on Hercules' right to limit its liability pursuant to 46 U.S.C. Secs. 183, et seq., has rendered this appeal moot. After entry of partial summary judgment on the exoneration issue, a bench trial was had on the issue of limitation of liability. The district court ruled that Hercules was not entitled to a limitation of liability. Case No. 83-3242 involves Hercules' appeal from this order. After the bench trial Hercules moved for exoneration from liability as to the State of Florida, arguing that the State was collaterally estopped from seeking recovery based upon the negligence of Pilot Lerro because a prior state administrative proceeding had found Pilot Lerro non-negligent and refused to revoke his pilot's license. The district court denied the motion, finding that the doctrine of collateral estoppel did not apply in this case. We affirm the three orders of the district court consolidated in this appeal.
 
 BACKGROUND
 
 8
 The following facts were stipulated to by the parties and recited by the district court. In re Complaint of Hercules Carriers, Inc., 566 F.Supp. 962 (M.D.Fla.1983):
 
 
 9
 Hercules Carriers, Inc., a Liberian corporation, was the registered owner of the SUMMIT VENTURE at all material times. Hercules Carriers, Inc., had time chartered the SUMMIT VENTURE to Showa Lines at all material times. Showa Lines had sub-chartered the vessel to Yamashita Shinnihon Lines at all material times. The SUMMIT VENTURE came to Tampa to load a cargo of bulk phosphate products. She arrived off the sea buoy on May 6, 1980, at 1634 hours. The ship had called at Tampa once in each of the preceding three years.
 
 
 10
 Dates and times as noted in the logbooks, bell books, engine order logger, and course recorder of the SUMMIT VENTURE are the best evidence of the facts as to those dates and times. The SUMMIT VENTURE was a diesel powered bulk carrier with the engine room and super structure aft. She was built in 1976 in Japan to the rules of the American Bureau of Shipping and was 609 feet in length, 51 feet in depth, 85 feet in breadth, and was, on the morning of May 9, 1980, drawing 9 feet forward and 21 feet aft. She was equipped with two 3-centimeter radars manufactured by Japan Radio Corporation.
 
 
 11
 The SUMMIT VENTURE was originally scheduled to get underway from her anchorage near the Tampa sea buoy on May 9, 1980, at or about 0500. The vessel's schedule was delayed at the recommendation of the pilot. Her anchor was heaved up at 0543 and she proceeded towards the sea buoy where she was boarded by Tampa Bay Deputy Pilot Lerro and Tampa Bay Observer Pilot Atkins at about 0625 near the entrance to the Egmont Channel. Shortly thereafter Atkins took the conn and conducted the vessel into Egmont Channel. After the pilots took the conn, the master did not take it again before the collision. The engine speed was increased to full speed ahead at 0650. At 0639 the vessel passed buoys 3 and 4 in Egmont Channel. At 0706 the vessel passed Egmont Key lighthouse. At 0721 the engine speed was ordered reduced to half ahead. At 0723 the vessel was at buoys 15 and 16. When the vessel reached a position two-tenths of a mile west from buoys 1A and 2A, radar contact with the buoys was lost. When the vessel was one-tenth of a mile west from buoys 1A and 2A, radar contact was regained for one or two sweeps of one radar. At 0731 the engine speed was ordered reduced to slow ahead. At 0732.5, Lerro ordered double full astern, hard aport, and let go anchors.
 
 
 12
 Subsequently, the starboard bow of the SUMMIT VENTURE came into contact with pier 2S on the Sunshine Skyway Bridge. A part of the bridge fell on the forecastle of the vessel and the spans of the bridge going northward from pier 3S to more than halfway between 1S and 1N collapsed. Several vehicles fell into the bay, including a Greyhound bus, resulting in the deaths of 35 people and injuries to one.
 
 
 13
 At all material times Venture Shipping (Managers) Ltd. was the general agent and Wah Kwong Shipping Agency Company, Ltd. was the sub-agent for Hercules Carriers, Inc. with respect to the SUMMIT VENTURE.
 
 
 14
 There was no error in the SUMMIT VENTURE's gyro compass. The gyro compass accurately indicated true headings. Deputy Pilot Lerro was a compulsory pilot. At all material times the 1970 edition of East Coasts of Central America and Gulf of Mexico Pilot was onboard the SUMMIT VENTURE.
 
 
 15
 Hercules, 566 F.Supp. at 966-67.
 
 
 16
 The following facts were adduced from the evidence at trial and are not contested on appeal:
 
 
 17
 The SUMMIT VENTURE was owned by Hercules Carriers, Inc., a Liberian corporation, and the vessel was registered under the laws of the Republic of Liberia. The stock of Hercules Carriers, Inc. was owned by a wholly owned subsidiary of Wah Kwong Shipping & Investment Co., Ltd., of Hong Kong. Hercules Carriers, Inc. appointed Venture Shipping (Managers), Ltd. as its general agent for the oversight of the building and operation of the SUMMIT VENTURE. Venture Shipping (Managers), Ltd. appointed Wah Kwong Shipping Agency Company as the sub-agent for the oversight of the construction, crewing, and operation of the vessel.
 
 
 18
 On May 9, 1980, the navigating team of the SUMMIT VENTURE was composed of Deputy Pilot John Lerro, Observer Pilot Bruce R. Atkins, Captain Hsiung Chu Liu, and Chief Officer Chan Csin Yee. Off watch and not involved in the navigation at material times were Second Officer Sun Chi Kong and Third Officer Lai Ying Ki. The bo'sun (lookout) was Sit Hau Po, the carpenter (anchor watch) was Lok Lin Ming, and the helmsman was Wong Sau Ho, an able bodied seaman.
 
 
 19
 Hercules, 566 F.Supp. at 967-68.
 
 
 20
 Second Officer Sun Chi Kong, in the normal course of his duties, made entries in the SUMMIT VENTURE's deck log in English. He also prepared deck log abstracts in English.
 
 
 21
 After the allision, Hercules Carriers, Inc. (Hercules) filed a limitation action under the Limitation of Liability Act, 46 U.S.C. Sec. 183, et seq., and Rule F of the Supplemental Rules for Certain Admiralty Claims, asking for either exoneration or limitation of liability. The claimants against Hercules included the State of Florida for damage to the bridge, Greyhound Bus Company for loss of a bus that fell off the bridge when it collapsed, wrongful death and personal injury claimants, and other shipping companies whose vessels were delayed in traveling into or out of Tampa Bay as a result of the accident. Hercules filed counterclaims against Florida and Greyhound and brought in the United States as a third-party defendant for allegedly improper weather warnings. The United States counterclaimed against Hercules.
 
 
 22
 Several of these claims are not before this court. Hercules obtained summary judgment against the delay claimants[1] and neither the claim against the United States nor any of the various counterclaims have yet come to trial. The personal injury and wrongful death claims have been resolved and are not before us on this appeal. Additionally, the claim of Greyhound Bus Lines, Inc., and Hercules' counter-claim against Greyhound have been settled. The three appeals before this court encompass the State of Florida's claim against Hercules for damages caused to the Sunshine Skyway Bridge and Hercules' defense that it was entitled to exoneration or in the alternative a limitation of liability. Because the appeals involved in 82-5733 and 83-3591, ultimately turn on the district court's finding that Hercules was not entitled to a limitation of liability (No. 83-3242), we will first address appellant's appeal of that issue.
 
 I. Limitation of Liability (No. 83-3242)
 Title 46 U.S.C. Sec. 183(a) provides:
 
 23
 The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not, except in the cases provided for in subsection (b) of this section, exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.
 
 
 24
 Under this statute, Hercules is liable beyond the value of the ship if it had privity and knowledge before the start of the voyage of the acts of negligence or conditions of unseaworthiness that caused the accident. Moreover, Hercules is not entitled to limitation if the ship was unseaworthy due to an incompetent crew or faulty equipment. See Horn v. Cia de Navegacion Fruco, S.A., 404 F.2d 422, 431-32 (5th Cir.1968), cert. denied, 394 U.S. 943, 89 S.Ct. 1272, 22 L.Ed.2d 477 (1969).[2] Therefore, a determination of whether a shipowner is entitled to limit his liability involves a two-step analysis. As stated in Farrell Lines, Inc. v. Jones, 530 F.2d 7 (5th Cir.1976): "First, the court must determine what acts of negligence or conditions of unseaworthiness caused the accident. Second, the court must determine whether the shipowner had knowledge or privity of those same acts of negligence or conditions of unseaworthiness." 530 F.2d at 10. Moreover, once a claimant satisfies the initial burden of proving negligence or unseaworthiness, the burden of proof shifts to the shipowner to prove the lack of privity or knowledge. See Coryell v. Phipps, 317 U.S. 406, 409, 63 S.Ct. 291, 293, 87 L.Ed. 363 (1943); Coleman v. Jahncke Service, Inc., 341 F.2d 956, 958 (5th Cir.1965), cert. denied, 382 U.S. 974, 86 S.Ct. 538, 15 L.Ed.2d 465 (1966).
 
 
 25
 This burden is not met by simply proving a lack of actual knowledge, for privity and knowledge is established where the means of obtaining knowledge exist, or where reasonable inspection would have led to the requisite knowledge. See China Union Lines, Ltd. v. A.O. Andersen & Co., 364 F.2d 769, 787 (5th Cir.1966) cert. denied, 386 U.S. 933, 87 S.Ct. 955, 17 L.Ed.2d 805 (1967). Thus, knowledge is not only what the shipowner knows but what he is charged with discovering in order to apprise himself of conditions likely to produce or contribute to a loss. See Avera v. Florida Towing Corp., 322 F.2d 155, 166 (5th Cir.1963).
 
 
 26
 We note that the district court in denying Hercules' entitlement to a limitation of liability made separate findings of negligence and unseaworthiness. In reviewing the petitioner's challenges to these findings, we will necessarily assess the negligence and unseaworthiness of the crew. In doing so the two categories will be merged for purposes of appeal because the test of reasonableness is the primary inquiry under both categories.[3]
 
 
 27
 The district court properly set forth the applicable legal standards in denying Hercules limitation of liability. However, Hercules asserts that the court misapplied the statutory standards of liability because it was hopelessly antagonistic to the policy behind the Limitation of Liability Act. It is true that the district court expressed some serious reservations about the Limitation Act when it stated:
 
 
 28
 The Limitation of Liability Act is an antiquated statute. It is time for Congress to take the wheel and re-examine the policies which led to the legislation. Granted there is little or no actual injustice when the statute is applied to a purely maritime case such as a collision between vessels. But how can a motorist who is unfamiliar with the maritime industry, customs, and the law, insure him or herself against the risk of such a tragic encounter?
 
 
 29
 Hercules, 566 F.Supp. at 978.
 
 
 30
 The district court, however, is not alone in its view of the Limitation Act. Our court in dicta has previously remarked that the Limitation Act is hopelessly anachronistic. See University of Texas Medical Branch at Galveston v. United States, 557 F.2d 438, 441 (5th Cir.1977), cert. denied, 439 U.S. 820, 99 S.Ct. 84, 58 L.Ed.2d 111 (1978). Moreover, the Supreme Court itself has taken a restrictive view of the statute. In The Main v. Williams, 152 U.S. 122, 14 S.Ct. 486, 38 L.Ed. 381 (1894), the Court stated:
 
 
 31
 While, from the universal habit of insuring vessels, the application of the statute probably results but rarely in an actual injustice to the owner of the injured vessel, yet, being in derogation of the common law, we think the court should not limit the right of the injured party to a recovery beyond what is necessary to effectuate the purposes of Congress.
 
 
 32
 152 U.S. at 132-33, 14 S.Ct. at 489. The Supreme Court has also recognized that the conditions that led to the original passage of the Act no longer exist.
 
 
 33
 Judicial expansion of the Limited Liability Act at this date seems especially inappropriate. Many of the conditions in the shipping industry which induced the 1851 Congress to pass the Act no longer prevail. And later Congresses, when they wished to aid shipping, provided subsidies paid out of the public treasury rather than subsidies paid by injured persons.
 
 
 34
 Maryland Casualty Co. v. Cushing, 347 U.S. 409, 437, 74 S.Ct. 608, 623, 98 L.Ed. 806 (1954) (footnote omitted).
 
 
 35
 Despite numerous judicial reservations about the Act, Congress has not seen fit to remove it from the books and accordingly the courts have a duty to apply the statute as written.[4] While we do not necessarily approve of the district court's dicta regarding its concerns over the Act, we find no merit in the appellant's suggestion that the district court was inherently prejudiced and antagonistic toward the Limitation Act. Nor do we find merit to appellant's claim that the district court adopted verbatim the appellees' proposed findings of fact as its conclusions of law. As detailed below, our review of the record and the district court's order convinces us that the district court properly found that Hercules was not entitled to a limitation of liability and that these findings were made independently based upon an abundance of evidence with respect to the negligence of the owners and crew, and a proper interpretation of the Act.
 
 A. Hercules' Contentions on Appeal
 
 36
 Most of Hercules' enumerations of error involve the factfindings of the district court regarding negligence and unseaworthiness. Findings of the district court establishing the privity and knowledge of Hercules, which appellant also disputes, are factual findings as well. All of these findings of fact are subject to review under the clearly erroneous standard. See Farrell Lines, Inc. v. Jones, 530 F.2d 7, 12 (5th Cir.1976); Waterman Steamship Corp. v. Gay Cottons, 414 F.2d 724, 738 (9th Cir.1969). Hercules cites Flowers v. Crouch-Walker Corp., 552 F.2d 1277 (7th Cir.1977) in arguing for a higher standard of review because the trial court adopted some of the proposed findings of fact submitted by the claimants. Flowers is not on point, as that case consisted almost entirely of the testimony of a single witness whose credibility was not challenged. Accordingly, the Flowers court held that when appellate review is primarily a matter of drawing inferences from undisputed facts or determining their legal implications, review is much broader than in the instance where disputed evidence and questions of credibility are involved. Clearly, we have the latter situation in this case where disputed evidence and questions of credibility were involved and therefore a "more critical review" of the findings of fact beyond the clearly erroneous standard is not permitted.
 
 B. Negligence and Unseaworthiness
 
 37
 As discussed above, the first step in determining a shipowner's entitlement to limitation of liability is to establish what acts of negligence or conditions of unseaworthiness caused the accident. In this case, negligence involves evidence of careless or improper operation of the ship by the crew. Because the shipowner has a non-delegable duty to provide a competent master and crew, unseaworthiness can be caused by insufficient manning of the vessel or an incompetent crew. Tug Ocean Prince, Inc. v. United States, 584 F.2d 1151, 1155 (2d Cir.1978), cert. denied, 440 U.S. 959, 99 S.Ct. 1499, 59 L.Ed.2d 772 (1979). Unseaworthiness may also result from improper maintenance of equipment or other related failures which make the vessel ill-suited for its duties at sea. As noted by the district court the two concepts are related because negligent operation of a vessel often results from improper training of the crew. The district court in its factual findings sets forth many instances of negligence and unseaworthiness that combined to cause the accident. In reviewing the findings of negligence and conditions of unseaworthiness by the district court, we bear in mind that fault in the abstract is not sufficient. To produce liability, the acts of negligence or conditions of unseaworthiness must be a contributory and proximate cause of the accident. See Board of Commissioners of the Port of New Orleans v. M/V Farmsum, 574 F.2d 289, 297 (5th Cir.1978).
 
 
 38
 (1) Speed
 
 
 39
 The district court held that Captain Liu was negligent in allowing his ship to be directed up the channel by the pilot at speeds ranging from half-speed ahead to full ahead. The district court's findings of fact with regard to speed were as follows: (1) At 0650, in the vicinity of buoy 6, the speed of the vessel was increased to full ahead or 13 knots over the water; (2) One-half mile after passing buoy 12, near buoy 14, and still proceeding full speed ahead, the weather had deteriorated so the bow of the ship could not be seen, indicating visibility was less than 500 feet; (3) Maintaining a speed of 13 knots, the SUMMIT VENTURE traveled from buoys 14 to 16, a distance of 1.25 nautical miles, in approximately five minutes. Just prior to reaching buoy 16 at 0721, the vessel's speed was reduced to half ahead or 9 1/2 to 11 knots. When the lookout, Boatswain Sit, arrived on the bow about 0723, he immediately sighted buoy 16 off the port bow as it passed down the port side of the vessel. The boatswain could not clearly see the color or shape of the sighted buoy because of the heavy fog and poor visibility. At that time the rain and wind increased, and visibility was approximately 300 to 500 feet--less than the ship's length. According to the posted maneuvering characteristics, emergency stopping distance of the vessel was in excess of 3,500 feet; (4) The vessel continued to proceed up Tampa Bay at one-half ahead, even though Pilot Lerro could not visually sight the next set of buoys; 1A and 2A. By the time the vessel was two tenths of a mile from buoys 1A and 2A, Atkins advised that the radar scope had been totally obliterated by heavy rainfall and that radar contact was lost. Although radar contact was momentarily regained for one or two sweeps of the port radar, buoys 1A and 2A were never visually sighted or seen again on radar. The vessel proceeded forward at one-half ahead at approximately 10 knots, toward the critical turning buoy and the bridge, which was less than one mile away; (5) Notwithstanding radar occlusion and virtually zero visibility, the vessel continued to proceed at 9 1/2 to 11 knots through the turn at buoy 2A, just seven-tenths of a mile away from the bridge. Under these conditions, the vessel required approximately 2500 feet to stop its forward motion. Pilots Lerro, Evans[5] and Atkins, all testified that the vessel was in violation of the speed and visibility rules at this point. At no time did Captain Liu or Chief Mate Chan communicate with the pilot or suggest that the ship be slowed or anchored; (6) At 0731, approximately seven-tenths of a mile from the Skyway Bridge and approximately three and one-half minutes prior to the collision, Pilot Lerro ordered the engine speed to slow ahead, but that reduction had no appreciable effect on the speed of the SUMMIT VENTURE; and (7) At 0732.5, Lerro ordered double full astern, hard aport, and let go both anchors, however only one anchor dropped. Before any of these emergency measures could take effect, the starboard bow of the SUMMIT VENTURE struck the Skyway Bridge, approximately 800 feet from the center line of the channel.[6] At the time of the allision, the vessel was proceeding at a speed of approximately eight knots. The allision with the bridge occurred at 0734.
 
 
 40
 It is clear from the evidence adduced at trial that the excessive speed of the SUMMIT VENTURE was the principal overt act of negligence causing the allision with the bridge. Hercules attempts to circumvent the fact of the SUMMIT VENTURE's excessive speed by citing to the testimony of four witnesses who stated that it would have been imprudent to attempt to stop the SUMMIT VENTURE in the circumstances existing on the morning of May 9, 1980, after the storm broke. The fallacy of this argument is two-fold. First, Hercules claims that the storm broke at buoy 2A when the facts clearly show that the SUMMIT VENTURE had been in a heavy rain storm for approximately two and one-half miles after passing buoy 14. Second, the evidence clearly establishes that the SUMMIT VENTURE's speed far exceeded minimum visibility requirements prior to buoy 2A and that attempts to reduce the vessel's excessive speed after passing buoy 2A had no appreciable effect. It is true that some circumstances would make low speed inappropriate, and Hercules in its appeal suggests that reducing speed below half ahead would have been imprudent because a greater speed was necessary to maintain control of the ship. However, the expert witnesses at trial stated only that an attempt to stop the ship during the heaviest rain after passing buoy 2A would have been imprudent. Significantly, they did not question the propriety of slowing at some point before buoy 2A, when the severity of the rain storm was evident and visibility virtually non-existent. Moreover, had the SUMMIT VENTURE been traveling at a more moderate speed prior to buoy 2A, attempts to slow the vessel after passing buoy 2A would have been more successful. Clearly the success of any attempt to stop the vessel by either backing the engine or dropping the anchors was directly correlated to the vessel's speed at the time these maneuvers were attempted, and certainly appellants cannot argue that stopping a vessel is imprudent when a bridge has been sighted and allision is imminent.
 
 
 41
 Article 16 of the Inland Rules, subtitled "Speed in Fog" provides: "Every vessel shall, in a fog, mist, falling snow, or heavy rainstorms, go at a moderate speed, having careful regard to the existing circumstances and conditions." 33 U.S.C. Sec. 192.[7] The Pennsylvania Rule provides that a statutory violation raises a rebuttable presumption that the ship caused the collision. The Pennsylvania, 86 U.S. (19 Wall) 125, 22 L.Ed. 148 (1874). If a statutory violation is proven, Hercules must demonstrate that the violation could not have been one of the causes of the allision. The Pennsylvania, 86 U.S. at 136. With regard to the moderate speed required in heavy weather under 33 U.S.C. Sec. 192, the half distance rule is a gloss that has been recognized by the courts. The Supreme Court in Union Oil Company of California v. The San Jacinto, 409 U.S. 140, 93 S.Ct. 368, 34 L.Ed.2d 365 (1972), defined the half-distance rule as follows: "If two vessels, upon sighting each other, are proceeding at rates of speed such that each can stop before it reaches the point at which the courses of the two intersect, collision is impossible." 409 U.S. at 144-145, 93 S.Ct. at 371.
 
 
 42
 Though this rule is not directly applicable here because a stationary object, the bridge, was involved, we find that the circumstances of this case clearly demonstrate a violation of the moderate speed rule. The facts show that from buoy 14 to the bridge, a distance of over three miles, Pilot Lerro allowed the vessel to proceed up the channel with visibility of 500 feet or less. With a ship length over 600 feet and visibility less than 500 feet, good seamanship plus the pilot's statutory duty under the moderate speed rule dictated that the ship be stopped by buoy 14 or 16.
 
 
 43
 Instead, Pilot Lerro chose to push ahead blindly at a grossly excessive speed when he could not even see the bow of the ship. Between buoys 14 and 16 the ship maintained a speed of 13 knots; at this speed the ship had an emergency stopping distance of 3,500 feet, or approximately seven times Pilot Lerro's actual visibility. Just prior to reaching buoy 16, the ship's speed was reduced to half ahead and upon reaching buoy 2A (which was never sighted), 1.3 miles away, the ship was traveling at 9 1/2 to 11 knots. At this point, the bridge was .7 miles away, visibility was zero and the ship's emergency stopping distance was 2,500 feet. Given the ship's speed, even if Pilot Lerro had been able to see the bridge at this point, full emergency stopping measures would have still brought the ship perilously close to the bridge. Pilot Lerro chose to push forward resulting in the tragic allision.
 
 
 44
 We can think of no greater case of misfeasance or gross negligence than as exemplified by the facts of this case. This strong language not only applies to Pilot Lerro, but also to Captain Liu and Chief Mate Chan who stood by mutely as these events unfolded in their full view. Likewise, we find absurd appellant's suggestion that the storm "suddenly broke" at buoy 2A and caught the crew of the SUMMIT VENTURE by surprise. As established by the facts recited above, the severity of the storm was clearly evident for over three miles prior to reaching the bridge, rendering any defense of surprise ludicrous.
 
 
 45
 Accordingly, we affirm the district court's finding, as a matter of law, that Captain Liu, as master of the SUMMIT VENTURE was negligent in allowing his vessel to proceed at the speeds ordered by Pilot Lerro under conditions of visibility of less than 500 feet.
 
 
 46
 (2) Use of Radar
 
 
 47
 The evidence showed that the two radars on the SUMMIT VENTURE when operated together at short range tended to interfere with one another. The district court found that the interference between the two radars, while not a statutory violation was a well-known fact, and consequently established negligence on the part of Hercules for allowing the ship to proceed to sea without correcting the known problem. Moreover, the district court found that Captain Liu had little knowledge and inadequate training in the use of the two radars aboard the SUMMIT VENTURE. The district court further found that contrary to company policy, none of the crew members aboard the SUMMIT VENTURE had a radar observer certificate, and that on the morning of the allision, Captain Liu failed to use the radar effectively by using one to track or monitor the approaching weather and the other to aid in navigation.
 
 
 48
 We find that while negligence existed because the two radars tended to interfere with one another and the owners of Hercules failed to have a crew member with a radar observer certificate aboard the SUMMIT VENTURE, this negligence was not a contributory and proximate cause of the allision. Though none of the crew members of the SUMMIT VENTURE had a radar observer certificate, both Pilot Lerro and Pilot Trainee Atkins had radar observer certificates and the evidence showed that Atkins was monitoring the radar. The evidence also showed that while the radar could detect rain it could not indicate the intensity of a storm. Furthermore, the severity of the storm was visually evident by buoy 14 when the bow could no longer be seen. Soon thereafter, approximately two tenths of a mile from buoys 1A and 2A, the radar scope became completely obliterated. It was at buoy 14 and beyond that the decision of whether to stop or slow the vessel was critical and proximately related to the ultimate allision with the bridge. There is no evidence that the lack of radar observer certificates among the crew members, Captain Liu's inexperience with the radars aboard the SUMMIT VENTURE, or the potential interference between the two radars at short range, had anything to do with the failure of the crew members aboard the SUMMIT VENTURE to properly slow or stop the vessel between buoy 14 and the bridge. That is, there is no evidence to suggest that the negligence with respect to the radar contributed to the series of events occurring between buoy 14 and the bridge. Accordingly, we hold that the district court's findings relating to radar interference and the lack of radar observer certificates as a contributory cause of the allision between the SUMMIT VENTURE and the Sunshine Skyway Bridge to be clearly erroneous.
 
 
 49
 (3) Posting of Lookouts
 
 
 50
 The district court found that it was negligent of Captain Liu not to send a lookout forward when the weather began deteriorating. The district court also found that when the lookout was sent forward he failed to perform his functions properly in that although he reported the sighting of a buoy, he did not report the color or whether or not he heard any sounds.[8] Furthermore, there was conflicting testimony as to which side of the ship the buoy passed and this not only suggested the inadequacy of the lookout's performance but also the likely relation between the improper performance of the lookout's duties and the vessel veering off course. Furthermore, the lookouts, Sit and Lok, received no instructions from the watch officer prior to going on watch regarding what to look for or what to expect during the voyage, a clear violation of the IMCO regulations. Moreover, Bo'sun Sit, whose primary duty was to serve as a lookout, found himself performing double duty as an anchor watch because only two men had been sent forward and a complement of three men was required to drop both anchors simultaneously. Thus, the negligence in the assignment of this particular lookout was further demonstrated by the fact that the lookout had divided duties. See St. Phillip Offshore Towing Co. v. Wisconsin Barge Lines, Inc., 466 F.Supp. 403, 409-10 (E.D.La.1979) (duty to post proper lookout cannot be fulfilled by person who has other duties); Harbor Towing Corp. v. Tug Reliance, 211 F.Supp. 896, 902 (E.D.Va.1963) (the lookout under adverse conditions serves as the "eyes of the ship" and should have no other duties). The appellant argues that despite the assignment of divided duties to the lookout, that on the morning of the allision he was at his assigned post as only a lookout and was well forward of the anchor engine at impact and narrowly escaped injury when a portion of the bridge fell onto the ship's forecastle. Thus, the appellant argues that the fact that the lookout might be ordered to assist another seaman in letting go anchors did not interfere with his primary duty as a lookout, and cites Farrell Lines, supra, 530 F.2d at 12 as supportive of this proposition. We find Farrell Lines not to be on point as that case did not involve a lookout but a second minor duty (bellbook entries) of a watch officer which did not detract from his primary duty of supervising the helmsman. Furthermore, the district court's ruling that posting a lookout with two assigned duties was negligent is supported by evidence of the poor performance of the lookout assigned; and therefore we cannot find the district court's holding as to this negligent act to be clearly erroneous.
 
 
 51
 (4) Anchor Watch
 
 
 52
 The district court found that as a matter of practice for the past 15 years, upon entering and leaving port, Captain Liu failed to insure that the anchors were ready for use so that both anchors could be let go if necessary. The court found this practice violated company regulations and was contrary to sound navigational practice and good seamanship. The district court further found that although Pilot Lerro requested that both anchors on the SUMMIT VENTURE be readied and that three men were required to drop both anchors simultaneously, only two men were on the bow and thus when the order was given only one anchor was dropped. The court found this to be evidence of unseaworthiness.
 
 
 53
 While the facts found by the district court constitute negligence and unseaworthiness, we find that these facts had no causative relation to the SUMMIT VENTURE's allision with the Sunshine Skyway Bridge. Because of the speed of the vessel and the late dropping of the anchor, it still had not caught hold at the point of allision. The testimony further indicated that given the speed of the ship, the dropping of both anchors would have had no appreciable effect because had they caught hold, the chains would have been ripped from the vessel because of its speed. (TL 571-572)[9] Consequently, we find the district court's holding that the negligence surrounding the anchor watch and anchors was a contributory cause to the accident to be clearly erroneous.
 
 
 54
 (5) Bridge Relief
 
 
 55
 The district court found that Captain Liu acted negligently in failing to follow the prescribed procedures when he relieved Chief Mate Chan as Officer of the Watch. The district court also found that:
 
 
 56
 Liu did not know the position or course of the SUMMIT VENTURE or the position of the other vessels in the vicinity and Liu failed to ask Chan for clarification in this regard. Furthermore, when Chan left the bridge at 0727, no relief officer was present and, thus, Liu had to act in a dual capacity, as master and duty officer on the watch, for seven to eight critical minutes prior to the collision, rendering Liu too busy to monitor the ship's course or ascertain its position.
 
 
 57
 566 F.Supp. at 974. Appellant argues that prior to relieving Chan, Liu had been on the bridge observing and monitoring and knew the situation without needing the chief officer to brief him. Appellant further argues that Captain Liu was available to perform any function that may have been required of the chief officer and that there were two other pilots on the bridge with the statutory duty of navigating the SUMMIT VENTURE through the channel, plus a helmsman, and that therefore, there were more than enough personnel on the bridge to navigate the SUMMIT VENTURE.
 
 
 58
 The deposition of Captain Liu indicates that he did not ask any questions of the pilot because he did not want to interfere or disturb the two pilots. Moreover, his testimony indicates that because he was acting as captain and master of the ship and also duty officer on watch when the chief mate went forward to stand by the anchor, that he did not have time to check and follow so many things. Furthermore, Captain Liu felt that with one pilot on the radar and one on the conn, the best thing he could do was to keep quiet and let the two pilots handle the ship. In sum, the evidence shows that Captain Liu was too busy with his dual responsibilities to perform his duty to oversee the pilots and to exercise authority over them when he believed the ship to be in danger. Likewise, with Chief Mate Chan gone from the bridge of the ship, there was no longer a crew member of the SUMMIT VENTURE present who could effectively monitor the course and speed of the ship and exercise his authority to question or override the pilots aboard who were tending to these matters.
 
 
 59
 The significance of the failure to utilize proper turnover procedures is evidenced by the testimony of Captain Liu and Chief Mate Chan regarding their concern over the handling of the ship by Pilot Lerro. Captain Liu stated that he was concerned about the safety of the ship for ten minutes prior to the allision. Chief Mate Chan testified that he thought the SUMMIT VENTURE should have been anchored at buoy 16. However, both failed to convey their concerns to Pilot Lerro or to each other.
 
 
 60
 Had the two officers gone through the appropriate turnover procedures, a discussion of the ship's speed and course along with the presence of other vessels and the location of the bridge would obviously have occurred. Moreover, it seems inevitable that during the ensuing discussion their mutual concerns over the piloting of the ship would have surfaced and been brought to the attention of Pilot Lerro. While the content of this non-existent conversation is speculative, the hypothetical exchange illustrated above, when compared with the absolute failure of Captain Liu and Chief Mate Chan to adequately communicate, demonstrates the total abdication by the two officers of their duties on board the ship. The failure to follow established procedures for turnover on the bridge resulted in critical communications never being exchanged--communications that very well may have averted the accident.
 
 
 61
 We affirm the district court's finding that Captain Liu acted negligently in allowing Chief Mate Chan to leave the bridge without briefing Captain Liu on the matters that Chief Mate Chan had been monitoring, and further failing to make provision for replacement of Chief Mate Chan before his departure.
 
 
 62
 (6) Captain Liu's Reliance on the Pilots
 
 
 63
 The district court found that Captain Liu was negligent in relying on the pilots and failing to remonstrate with them. The IMCO rules[10] and recommendations which were binding on the crew of the SUMMIT VENTURE provided:
 
 Navigation with Pilot Embarked
 
 64
 Despite the duties and obligations of a pilot, his presence on board does not relieve the master or officer in charge of the watch from their duties or obligations for the safety of the ship. The master and pilot shall exchange information regarding navigation procedures, local conditions and the ship's characteristics.
 
 
 65
 Furthermore, the Supreme Court in The China, 74 U.S. (7 Wall.) 53, 67-68, 19 L.Ed. 67 (1869) noted:
 
 
 66
 It is the duty of the master to interfere in cases of the pilot's intoxication or manifest incapacity, in cases of danger which he does not foresee, and in all cases of great necessity. The master has the same power to displace the pilot that he has to remove any subordinate officer of the vessel. He may exercise it, or not, according to his discretion. (footnote omitted) (emphasis added).
 
 
 67
 The district court found unequivocably that the circumstances surrounding the approach to the bridge made out such a case of great necessity that it was blatant negligence on the part of Captain Liu to allow the ship to proceed under the control of Pilot Lerro after Captain Liu became aware or should have become aware of the inevitable risk of accident. Indeed, Captain Liu testified that he had been concerned about the safety of the vessel for approximately ten minutes before the allision. Moreover, while on paper, the shipowner followed the IMCO rules and recommendations, the evidence showed that the actual practice of the company was to permit all navigational decisions to be made by a pilot when on board and that the master could only relieve the pilot if he was acting in a drunken or crazy manner. According to Port Captain Chaing the shipowner's policy was that the pilot is in command and in charge. Accordingly, the district court found that Captain Liu's adherence to the company's policy constituted negligence when he relinquished to Pilot Lerro his responsibility for the safety of the ship.
 
 
 68
 Chief Mate Chan, who later went forward to monitor the anchor watch, testified that he believed the SUMMIT VENTURE should have anchored at buoy 16. However, he said nothing to Pilot Lerro about his concerns. The district court found that because of the company's unwritten policy against interfering with compulsory pilots that neither Chief Mate Chan nor Captain Liu realized that when a vessel is being piloted by a compulsory pilot that the master and officers of the vessel are not relieved of their ultimate responsibility to insure the safety of the vessel.[11] This misunderstanding as to ultimate responsibility is most obvious in the case of Chief Mate Chan who thought the vessel should have been anchored at buoy 16 but did not think he had the authority to either discuss anchoring with the pilot or in fact anchor over the objections of the pilot if he concluded that the ship was in a dangerous situation.
 
 
 69
 The appellant's principal defense is based upon testimony of Captain Liu that as captain of the ship he had authority to give an order to the pilot and that no one from the company had ever told him that the pilot was in command of the ship when he was aboard. Captain Liu further testified that he would principally rely on the pilot but that in the final analysis the captain had the final responsibility and that if the pilot was doing something wrong, he should overrule him.
 
 
 70
 However, there was conflicting testimony by Captain Liu at deposition and at trial concerning his understanding of his authority to question or overrule Pilot Lerro. At deposition, Captain Liu stated that he was concerned about the ship's position for ten minutes prior to the allision but that he gave no consideration whatsoever to stopping his vessel because he thought it was a one-man show, referring to the fact that the pilot had total control of the ship. (TB 147-148). At trial Captain Liu stated he did not think he had the authority to say "I want to stop and anchor the vessel" to the pilot or to anyone else. (TL at 104). Furthermore, Port Captain Chaing, the company officer in charge of insuring that the IMCO regulations were followed, testified on numerous occasions in his deposition that the pilot was in command of the ship. While this interpretation is completely contrary to the IMCO rules and the company's written regulations, the evidence showed that Port Captain Chaing's interpretation was, in actual practice, the rule suggested and followed by the company's officers.
 
 
 71
 Hercules insists that the district court made inconsistent findings regarding Captain Liu's comprehension of the company policy toward compulsory pilots, and that given Captain Liu's admitted comprehension of official company policy, the court was precluded from finding the owners were in privity with the negligence resulting from Captain Liu's failure to remonstrate with the pilots.
 
 
 72
 The passages from the district court opinion cited by Hercules read:
 
 
 73
 The testimony of Captain Liu shows clearly that he understood that both the law and the company policy allowed him to discuss areas of concern with the pilots, and that he had the power to overrule or relieve pilots.
 
 
 74
 Hercules, 566 F.Supp. at 974.
 
 
 75
 Further, the evidence shows, and I so find, that petitioner has failed to demonstrate that the company's policy whereby the pilot, rather than the master, was in ultimate command of the vessel was without its privity and knowledge.
 
 
 76
 Hercules, 566 F.Supp. at 979.
 
 
 77
 These two passages when read within the entire context of the opinion do not reflect inconsistent findings by the district court. They demonstrate the basis for the district court's ruling that Captain Liu ignored the written company policy in favor of the inconsistent, unwritten company policy to defer to a pilot who is navigating. The evidence adduced at trial and through deposition clearly demonstrated that Captain Liu had adopted the unwritten company policy as his own official operating policy.
 
 
 78
 Having reviewed the entire testimony on this subject and given the blatant negligence of Captain Liu and Chief Mate Chan in failing to intervene when both had serious concerns over the safety of the vessel, we find that the trial court was correct in concluding that the failure of Captain Liu and Chief Mate Chan to intervene was proximately related to the allision and that their failure to intervene resulted from the unwritten policy of the company to defer completely to the pilot on board.
 
 
 79
 (7) Dissemination of Crew Training Information
 
 
 80
 The district court found that Captain Liu was negligent in failing to instruct or train the crew of the SUMMIT VENTURE and failed to disseminate to them critical company and navigational information. Captain Liu admitted that he had never shown the company regulations or the IMCO rules to his deck officers before the allision, nor had he inquired whether any of his mates had read or periodically reviewed these regulations. The district court found that this particularly affected Chief Mate Chan who had never had the company policies and binding regulations outlined for him. The district court found that the failure to properly instruct Chief Mate Chan was a proximate cause in his failure to exercise his authority over the pilot when he perceived that the ship was in obvious danger. In other words, had Chief Mate Chan been instructed on the IMCO rules and the shipowner's manual, he would have realized his responsibility to take action when he believed the vessel was in danger. The district court was correct in holding that the failure of Captain Liu to properly instruct his crew was an act of negligence and was proximately related to the allision.
 
 
 81
 (8) Invalid Licenses
 
 
 82
 The district court found that Chief Mate Chan and Second Mate Kong[12] did not have valid Liberian licenses on the date of the allision because the Chinese licenses which had been presented in order to obtain their Liberian licenses could not be validated. A company official testified that the company took the Chinese licenses at face value. The district court found this position to be totally unreasonable and inexcusable for a company which operates ocean going vessels, regardless of the alleged competency of the unlicensed senior officers.
 
 
 83
 The appellant argues that there was no evidence that the underlying Chinese licenses were obtained by fraud and that the only evidence of invalidity was that the Liberian authorities were unable to validate the underlying Chinese licenses upon the strength of which the reciprocal Liberian licenses were granted. Appellant's principal contention is that there was no indication of any causal connection between the invalid Chinese licenses and the allision. Appellant also contends that the company had received from the Liberian government a list of suspect license numbers and the names of suspected licensees. The Chief Mate and Second Officer were not on this list and therefore appellant argues that it had no reason to suspect that these licenses were invalid.
 
 
 84
 However, the evidence shows that the shipowner had the capability of checking on the validity of the underlying Chinese licenses but failed to check with respect to the licenses of Chief Mate Chan or Second Mate Kong before or after hiring them. Moreover, prior to the allision on May 9, 1980, Hercules was aware of a continuing problem in its fleet with the use of counterfeit and fraudulent licenses. However, the company policy was that if a man had been employed by Wah Kwong for several years, the company accepted the license at face value. (TL 392-395).
 
 
 85
 The courts have noted that it is possible to estimate the competency of a vessel's crew by examining their licenses. See In re Ta Chi Navigation (Panama) Corporation, S.A., 513 F.Supp. 148, 159 (E.D.La.1981), aff'd, 728 F.2d 699 (5th Cir.1984). Licensing requirements are promulgated to insure that seamen are properly trained and will know their duties and responsibilities when aboard a vessel at sea. The district court in finding that Wah Kwong Company was negligent in not validating its officers' licenses did not relate this particular negligence to any specific fact contributing toward the accident. However, we find that the invalid license of Chief Mate Chan is further evidence that he was ill-equipped to perform the duties necessary for the safe navigation of the vessel. The incompetency of this unlicensed crew member was manifested by his failure to (1) inform the lookout as to his duties, (2) maintain his position on the bridge until a relief officer was present, (3) insure the navigation of the vessel by requiring compliance with the rules of the road in restricted visibility, and (4) seek clarification from or countermand Pilot Lerro when Chan thought the vessel should have been anchored at buoy 16 or before.
 
 
 86
 It is clear from the facts enumerated above that the district court was correct in finding that the crew on board the SUMMIT VENTURE was negligent and unseaworthy on the date of the allision with the Sunshine Skyway Bridge and that their negligence and unseaworthiness was a proximate cause of that allision.
 
 C. Privity and Knowledge
 
 87
 Having reviewed the acts of negligence and conditions of unseaworthiness which proximately caused the accident, we conclude the claimants have met their burden of proof. Thus, the second element in determining whether the petitioner is entitled to a limitation of liability must be addressed. The petitioner is not entitled to a limitation of liability if it is shown that the shipowner had knowledge or privity of the specific acts of negligence or conditions of unseaworthiness which caused the accident. As stated by the district court:
 
 
 88
 Petitioner admits that in the context of a corporation, "privity and knowledge" means the privity and knowledge of a managing agent, officer or supervising employee, including supervisory shoreside personnel, and that the privity and knowledge of Wah Kwong is the privity and knowledge of Hercules.
 
 
 89
 Hercules, 566 F.Supp. at 977. Before trial the petitioner admitted that the shipowner had the burden of proving its lack of privity and knowledge.
 
 
 90
 (1) Hercules' Allegations of Error
 
 
 91
 Hercules argues that the effect of the district court holding is to make the shipowner liable without limitation for errors of navigation and management of the vessel, unless the owner adopts a failsafe method of monitoring performance. Hercules points out that such a ruling would be contrary to law and public policy. Hercules cites Farrell Lines, Inc. v. Jones, 530 F.2d 7 (5th Cir.1976) as authority claiming that, there, as here, the predominating cause of the accident was held to be navigation error. Hercules contends that in both cases the predominating error occurred without the privity or knowledge of the shipowner. In Farrell Lines, the court of appeals in holding that the shipowners were entitled to limitation of liability, concluded that although the elimination of the personnel and equipment errors "might have reduced the possibility of collision, that is not the standard by which we are to determine ... limitation. Rather, we must ask whether the procedures and equipment utilized rendered the vessel reasonably fit under the circumstances." Farrell Lines, supra, 530 F.2d at 12 (footnote omitted) (emphasis in original). The appellant argues that the district court failed to apply this standard and erred in not finding that the procedures and equipment utilized by Hercules rendered the vessel reasonably fit under the circumstances.
 
 
 92
 The appellant next points to passages in the district court opinion where the court used the word "insure" and argues that the use of this language clearly indicates that the district court was imposing on Hercules the obligation of an insurer rather than the obligation of reasonable care or due diligence. The appellant also contends that the allision was not caused by insufficient personnel on the bridge or on the bow, the failure to follow formal turnover procedures, the master being on the bridge without a watch officer, or the fact that the Chinese licenses of two of the three mates could not be validated. Appellant claims that the district court erred in placing failsafe requirements upon the shipowner to guarantee that the above infractions not occur as a prerequisite to a grant of limitation of liability. Finally, the appellant generally argues that the cases cited by the district court in support of its finding of privity and knowledge are not on point because those cases involve negligent acts or conditions of unseaworthiness obviously within the knowledge of the owners, whereas in this case failure to slow or come to anchor sooner was obviously the result of operational decisions made exclusively on the bridge of the ship, negating any possibility of privity or knowledge on the part of the owners.
 
 
 93
 (2) The District Court Correctly Found Privity and Knowledge
 
 
 94
 First, Hercules' citation to Farrell Lines is unavailing because that case is distinguishable upon its facts. In Farrell Lines, the parties agreed that the primary cause of the allision was a navigational error not within the privity or knowledge of the owner. "In this case, all agree that the predominating cause of the accident was the navigational error of the helmsman in improperly executing his orders. There is also agreement that this navigational error was without privity or knowledge of Farrell." Farrell Lines, supra, 530 F.2d at 10. The above situation is simply not Hercules' case, for the district court found numerous acts of negligence and conditions of unseaworthiness as contributing to the allision. While Hercules argues that the cause of the allision was the combination of a sudden storm and the navigational and operational errors of Pilots Lerro and Atkins, all beyond the privity and knowledge of Hercules, as we recite below we find it indisputable that the negligence and unseaworthiness of the crew of the SUMMIT VENTURE proximately caused the ultimate allision of the vessel with the Sunshine Skyway Bridge and that such negligence and unseaworthiness was within the privity and knowledge of the owners.
 
 
 95
 First and foremost, we hold that the district court was correct in finding that the company's unwritten policy of placing the pilot rather than the master in ultimate command of the ship proximately contributed to the allision. It is clear that Lerro was negligent in proceeding up the channel at an excessive speed and failed to properly slow or stop at or after buoy 14; it is equally clear that if Captain Liu had complied with his duty to insure the safe navigation of the vessel the allision would have been averted. Moreover, the evidence showed that Chief Mate Chan failed to discuss or question the pilot about his operation of the vessel, even though Chief Mate Chan stated that he thought the ship should have been anchored at buoy 16. Because Chief Mate Chan was unaware of his obligation and authority to question and override the pilot, he failed to act upon his judgment that the vessel was in eminent danger.
 
 
 96
 In reference to the above acts, we AFFIRM the district court's finding that the petitioner failed to demonstrate that the company's unwritten policy of putting the pilot rather than the master in complete command was beyond its privity and knowledge. As found by the district court:
 
 
 97
 Port Captain Chaing, a former master and current managerial officer of Wah Kwong, testified that according to shipowner's policy, the pilot was not merely an adviser, but was, in fact, in command of the ship. Clearly, Captain Liu's and Chief Mate Chan's conduct on May 9, 1980, was confirmation of this company policy. In addition, it was Port Captain Chaing's responsibility to insure that the IMCO regulations, which by his own admission are binding on the SUMMIT VENTURE, are being followed. The IMCO rules provide that a pilot's presence on board a vessel does not relieve the master or watch officer of their duties and obligations.
 
 
 98
 Hercules, 566 F.Supp. at 979.
 
 
 99
 Thus, Hercules has failed to establish its lack of privity and knowledge of the negligence of its crew members where the crew's failure to countermand the obvious negligence of Lerro resulted in the accident. That failure of the crew resulted from Hercules' policy of instructing its crews not to countermand the actions of a pilot. Nothing could better illustrate an owner's privity and knowledge than its direction to its crew to disregard an IMCO regulation.
 
 
 100
 The evidence is clear that Wah Kwong was on notice that there was a potential problem with fraudulent licenses in its fleet but failed to properly investigate and ascertain the validity of Chief Mate Chan's or Second Mate Kong's licenses. Privity and knowledge is established where a shipowner could have obtained the information through reasonable and prudent inspection. See China Union Lines, Ltd. v. A.O. Andersen & Co., 364 F.2d 769, 787 (5th Cir.1966), cert. denied, 386 U.S. 933, 87 S.Ct. 955, 17 L.Ed.2d 805 (1967).
 
 
 101
 The evidence adduced also supported the conclusion by the district court that the shipowner's failure to provide an adequate training program for the crew of the SUMMIT VENTURE proximately contributed to the allision. For instance, due to the lack of training, Chief Mate Chan was uninformed as to the Inland Rules of the Road, IMCO regulations, and his duties as officer of the watch. As found by the district court, this inadequate training led to the following negligent acts of Chief Mate Chan: (1) failure to post or properly inform a diligent lookout who had no other duties; (2) leaving the bridge of the vessel without a relief officer and without informing Captain Liu of the position and speed of the SUMMIT VENTURE; (3) failure to plot or reaffirm the position of the SUMMIT VENTURE; (4) failure to insure the safe navigation of the SUMMIT VENTURE by requiring compliance with the rules of the road in restricted visibility; and (5) neglecting to inquire or intervene when it was apparent that Pilot Lerro was placing the SUMMIT VENTURE in peril. We agree with the district court's finding that the above-listed negligent acts contributed to the accident and are directly attributable to Hercules in failing to exercise due diligence in selecting, training and maintaining a competent crew.
 
 
 102
 Because of the petitioner's privity and knowledge as to the crew's negligence and unseaworthiness as enumerated above, it cannot claim that it is entitled to a limitation of liability because the accident was purely the result of an erroneous navigational judgment. As stated in In re Ta Chi Navigation (Panama) Corporation, S.A., 513 F.Supp. 148, 158 (E.D.La.1981), aff'd, 728 F.2d 699 (5th Cir.1984):
 
 
 103
 The actual conduct of such an incompetent crew which is the cause of the damage may involve the navigation or management of the vessel; nonetheless if incompetence results in a navigational error which causes the collision, it is crew incompetence, and therefore the unseaworthiness of the vessel, which has caused the ... damage. The fact that the unseaworthiness can be labeled as an error in navigation does not magically protect the shipowner from liability. At some point along a spectrum of performance competency, an error in navigation is attributable to incompetence on the part of the crew.
 
 
 104
 The negligent navigation by Lerro became the responsibility of the owner when it failed to train its crew and authorized crew members to ignore the IMCO regulation and its own manual with respect to the officers' right to take command of the vessel from Lerro.
 
 
 105
 The appellant contends that the court's use of the word "insure" in its discussion of privity and knowledge was tantamount to making Hercules an insurer, rather than requiring it to use reasonable care or due diligence. This argument is untenable. Taken in context, it is obvious that the court was not using the word insure in the sense of requiring Hercules to be an absolute insurer of all acts by its crew, but in the context of "to make sure" that Hercules' responsibilities as owner were fulfilled, that is; exercising due diligence to furnish a competent, trained crew, provided with necessary information. The use of the word insure by the district court is not a fatal flaw; indeed, our court has previously used this term in holding that the shipowner has a duty of "insuring" that the vessel has an adequate and competent crew. See Horn v. Cia de Navegacion Fruco, S.A., 404 F.2d 422, 432 (5th Cir.1968), cert. denied, 394 U.S. 943, 89 S.Ct. 1272, 22 L.Ed.2d 477 (1969).
 
 
 106
 Likewise, as Hercules cannot avoid full liability by claiming simple navigational error beyond its privity and knowledge, it also cannot claim that the inadequate training and unwritten company policies that were violative of the inland rules and IMCO regulations were beyond its privity and knowledge. See Avera v. Florida Towing Corporation, 322 F.2d 155, 166 (5th Cir.1963) (measure of knowledge that fulfills the duty of inquiry is not simply what the owner knows but what he is charged with finding out); In re Ta Chi Navigation (Panama) Corporation, S.A., 513 F.Supp. 148, 158-159 (E.D.La.1981), aff'd, 728 F.2d 699 (5th Cir.1984) (incompetency of the crew demonstrated by their actions and limitation defeated when the shipowner failed to demonstrate adequate inquiry into competency or provision of adequate training).
 
 
 107
 In sum, Hercules had a duty to make inquiry as to the competency of the SUMMIT VENTURE's crew and to verify that its written instructions were being followed. Privity and knowledge exists where the owner has actual knowledge, or could have and should have obtained the information by reasonable inquiry or inspection. Hercules is not entitled to a limitation of liability as it has failed to establish that it did not have actual knowledge of the crew's negligence and conditions of unseaworthiness or in the alternative failed to prove that it could not have obtained the information by reasonable inquiry or inspection.
 
 II. Collateral Estoppel (No. 83-3591)
 
 108
 Soon after the accident occurred, the Department of Professional Regulation (DPR), an administrative agency of the State of Florida, brought administrative proceedings against Pilot Lerro to revoke his pilot's license. The Board of Pilot Commissioners (a division of the DPR) ruled that Lerro was not negligent in the incident and could therefore retain his pilot's license. On the basis of this ruling, Hercules submits that the State of Florida, as a claimant through its Department of Transportation, should have been collaterally estopped from relitigating the issue of Pilot Lerro's negligence at the limitation trial. We hold that the district court did not err in refusing to collaterally estop the State of Florida from pursuing its negligence claim in a civil proceeding before the federal court.
 
 
 109
 A. Unavailability or Impropriety of Collateral Estoppel Against the State Government
 
 
 110
 In United States v. Mendoza, 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984), the Supreme Court held that nonmutual offensive collateral estoppel may not be invoked against the government. While the collateral estoppel sought in this case is defensive and the petitioner seeks to invoke it against a state government rather than the federal government, we hold that the policy rationale behind Mendoza applies to the facts of this case.
 
 
 111
 Under the doctrine of collateral estoppel, the resolution by a court of an issue of fact or law necessary to its judgment precludes the relitigation of that issue in a subsequent suit based on a different cause of action involving a party to the prior litigation.[13] See Montana v. United States, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979). As stated by the Supreme Court:
 
 
 112
 Collateral estoppel, like the related doctrine of res judicata, serves to "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication."
 
 
 113
 Mendoza, 104 S.Ct. at 571, quoting Allen v. McCurry, 449 U.S. 90, 94, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980) (footnote omitted).[14] The courts have broadened the scope of this doctrine in recent years by abandoning the requirement of mutuality of parties. See Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971).
 
 
 114
 However, the Supreme Court has long recognized that the government is not in the same position as a private litigant, given the geographical breadth of government litigation and the nature of the issues litigated by the government. See Mendoza, 104 S.Ct. at 572. In ruling that nonmutual collateral estoppel should not be applied against the government, the Supreme Court in Mendoza cited several considerations. The Court noted that not only is the government frequently involved in legal questions of substantial public importance but that the government is more likely than private litigants to be involved in lawsuits against different parties that involve the same legal issues. Moreover, the Court noted that given the government's frequent involvement in litigation that its conduct in such litigation differs from that of a private litigant because while a private litigant will rarely forego an appeal if there is a chance of ultimately prevailing, the government traditionally considers a variety of factors before appealing, such as limited government resources and the crowded dockets of the courts. Mendoza, 104 S.Ct. at 573. The Court found that applying the doctrine of nonmutual estoppel against the government would force it to abandon its policy of limited appeal and force it to appeal every adverse decision to prevent foreclosure of further review. The concern of the Supreme Court as to this matter is reflected in the present case as the DPR chose not to appeal the final order of the Board of Pilot Commissioners.
 
 
 115
 The Court was also cognizant of the fact that the Executive Branch over the course of time may find it prudent to take differing positions with respect to resolution of a given issue, stating:
 
 
 116
 [T]he panoply of important public issues raised in governmental litigation may quite properly lead successive Administrations of the Executive Branch to take differing positions with respect to the resolution of a particular issue. While the Executive Branch must of course defer to the Judicial Branch for final resolution of questions of constitutional law, the former nonetheless controls the progress of government litigation through the federal courts. It would be idle to pretend that the conduct of government litigation in all its myriad features, from the decision to file a complaint in the United States District Court to the decision to petition for certiorari to review a judgment of the Court of Appeals, is a wholly mechanical procedure which involves no policy choices whatever.
 
 
 117
 Mendoza, 104 S.Ct. at 573.
 
 
 118
 We hold that the rationale outlined by the Supreme Court in Mendoza for not applying nonmutual collateral estoppel against the government is equally applicable to state governments. Indeed, we take notice that the Supreme Court in reaching its holding did not differentiate between federal governmental interests and state governmental interests, nor was there anything to suggest that the concerns expressed by the Supreme Court were peculiar to the federal government. Nor do we see any substantive difference between nonmutual offensive collateral estoppel which the Supreme Court addressed and nonmutual defensive collateral estoppel; in each instance the concerns expressed by the Supreme Court are applicable here:
 
 
 119
 The conduct of government litigation in the courts of the United States is sufficiently different from the conduct of private civil litigation in those courts so that what might otherwise be economy interests underlying a broad application of collateral estoppel are outweighed by the constraints which peculiarly affect the government. We think that our conclusion will better allow thorough development of legal doctrine by allowing litigation in multiple forums. Indeed, a contrary result might disserve the economy interests in whose name estoppel is advanced by requiring the government to abandon virtually any exercise of discretion in seeking to review judgments unfavorable to it. The doctrine of res judicata, of course, prevents the government from relitigating the same cause of action against the parties to a prior decision, but beyond that point principles of nonmutual collateral estoppel give way to the policies just stated.
 
 
 120
 Mendoza, 104 S.Ct. at 574 (footnote omitted).
 
 
 121
 The petitioner tries to distinguish Mendoza by claiming that mutuality is present in this case even though Hercules was not a party to the revocation proceeding because Hercules under the doctrine of respondeat superior is vicariously liable for any negligence of Lerro. Although we note that this argument is inconsistent with Hercules' claim in Appeal No. 82-5733, even assuming that Hercules and Lerro are the same parties for collateral estoppel purposes, we find that the State of Florida DPR and DOT are not the same parties and therefore the assertion of collateral estoppel is nonmutual. The Florida DPR initiated the license proceeding, while the Florida DOT is the party involved in the civil proceeding. We find that these two agencies had different functions and interests and should not be considered privies to one another for purposes of collateral estoppel.
 
 
 122
 First, the DPR in the license revocation proceeding was not acting as a party seeking affirmative relief from Lerro. Rather, the DPR was acting as a regulatory body to insure that a person holding a license was competent to serve the public and that if such person was incompetent, the DPR had the responsibility to seek revocation of his license in the public interest. Thus, the state in the license revocation proceeding was carrying out its function as parens patriae to insure that those authorized by it to serve the public were competent to do so. On the other hand, in its civil action, where it sought monetary damages, the state, through the DOT, was performing its function as protector of the public fisc and its interest in establishing the negligence of Pilot Lerro was not penal in nature but rather sought monetary recovery for the damage caused by his negligence. The policy reasons for not applying the doctrine of nonmutual collateral estoppel to these two state agencies are obvious. Collateral estoppel would cast doubt on the ability of the DPR to follow its usual procedures in regulating pilots, for the risk of collateral estoppel would cause it to consult with the DOT, and perhaps postpone the proceedings or change its strategy to accommodate the DOT. These concerns would necessarily impair the proper functioning of the state government and would hinder it in fulfilling its duties to the state citizenry.
 
 
 123
 Second, the circumstances of this case present stronger reasons than those present in Mendoza for not applying non-mutual collateral estoppel. In Mendoza, the relevant government agency, the Immigration and Naturalization Service (INS), was a party to both proceedings, and in the second proceeding sought to litigate the identical issue involved in the first proceeding. As noted above, this case involves two wholly separate state agencies with different interests and functions. The distinction is a critical one given the varied interests a governmental body must pursue; if Mendoza stands for anything, it must stand for the proposition that a government's agencies in pursuing their stated goals must not be put in the untenable position of collaterally estopping one another when they pursue the same issue for wholly different purposes.
 
 
 124
 Finally, the most significant consideration in determining whether to invoke collateral estoppel is whether the party had a full and fair opportunity to litigate the issue to be estopped. Parklane Hosiery Co. v. Shore, 439 U.S. 322, 328, 99 S.Ct. 645, 650, 58 L.Ed.2d 552 (1979). Having reviewed the administrative proceedings before the Board of Pilot Commissioners, we conclude that the issues before the administrative agency and the district court were substantively distinct, making collateral estoppel inappropriate.
 
 
 125
 We have thoroughly reviewed the factual findings of the Administrative Hearing Officer and the approval of those findings by the Board of Pilot Commissioners. The administrative findings regarding Pilot Lerro's negligence were very narrowly drawn and in no way approximated the detailed findings of negligence made by the district court, which we have approved this day.
 
 
 126
 It is clear that the Administrative Hearing Officer focused almost exclusively on the events occurring just prior to buoys 1A and 2A and thereafter; and found nothing unusual about the SUMMIT VENTURE's speed or the weather conditions prior to reaching buoys 1A and 2A. For instance, the hearing officer found that:
 
 
 127
 The Summit Venture's inbound transit on the morning of May 9, 1980 was normal with weather conditions commonly encountered and normal traffic on the bay until the vessel reached a point in Mullet Key Channel .9 miles from the Sunshine Skyway Bridge, and .2 miles from the turning buoys # 1A and # 2A which mark the entrances to A Cut Channel. At that point the Summit Venture and Lerro encountered a sudden, unexpected and intense storm which reduced visibility to zero.
 
 R.E. at 131.[15]
 
 128
 With regard to the so called "sudden onset" of the storm the hearing officer found:
 
 
 129
 Of the several expert pilots who testified on the question, all agree that when Lerro lost visibility and radar contact at the onset of the storm approximately .9 miles from the Sunshine Skyway Bridge, his choice to attempt to navigate through the bridge as opposed to turning port, starboard, or going full-astern was a reasonable, prudent choice.
 
 
 130
 R.E. at 132.
 
 
 131
 Given this expert testimony, the hearing officer concluded:
 
 
 132
 As established by the testimony of the expert pilots appearing in this cause, the speeds maintained by Lerro on the Summit Venture during her approach to the Sunshine Skyway Bridge were reasonable and prudent under the existing weather conditions. Slower speeds on the vessel would have risked control problems.
 
 
 133
 R.E. at 134.
 
 The hearing officer ultimately concluded:
 
 134
 Thus, construing the Administrative Complaint strictly, the Petitioner's own evidence establishes that up to the point of the storm Lerro had properly performed his duties as a pilot, that he should not have attempted to halt the way of the vessel, and that his only choice was to navigate blindly through the existing weather which he found himself in through no fault of his own. When the facts established by this strict view of the Administrative Complaint are measured against the standard of care required of a pilot it must be concluded that Petitioner has failed to prove that Lerro's actions were negligent.
 
 
 135
 R.E. at 139.
 
 
 136
 The above excerpts establish conclusively that while the legal issue negligence, may have been similar, the facts at issue before the two proceedings differed substantially. Most significantly, our affirmance of the district court's findings of negligence principally rests upon the failure of Pilot Lerro to slow sufficiently or anchor between buoys 14 and 16. A review of the administrative record shows that the hearing officer found nothing unusual about Pilot Lerro's actions at those points. The evidence adduced at trial indicated otherwise. The scope of the two proceedings was fundamentally different.[16]
 
 
 137
 Moreover, at the limitation trial, the district court not only made findings as to the negligence of Pilot Lerro, but also made specific findings as to the negligence of Captain Liu, Chief Mate Chan and the crew members of the SUMMIT VENTURE. Clearly, the State of Florida is in no way collaterally estopped from asserting the liability of Hercules for the negligence of Captain Liu, Chief Mate Chan and the crew members of the SUMMIT VENTURE. These facts demonstrate the lack of identity in the proceedings and reveals the fundamental unfairness that would result from permitting collateral estoppel in this instance.
 
 
 138
 We find this case to be very similar to Frederick E. Bouchard, Inc. v. United States, 583 F.Supp. 477 (D.Mass.1984), where the court held that an Administrative Law Judge's ruling, in a license revocation proceeding, that the master of the subject tug was not negligent, did not preclude the United States from asserting a negligence claim against the tug and its owners and operators. As noted by the court:
 
 
 139
 The question of the movants' negligence was not actually litigated in the license revocation hearing. The movants correctly contend that under the doctrine of respondeat superior, they would be liable for the negligence of the master and mate of the tug. However, it does not follow that since these employees were not found negligent in relation to the specific charges there involved, the movants cannot be found negligent .... Moreover, it is not clear that the meaning of negligence in these different contexts is identical. In addition, the movants may have been negligent in ways unrelated to the conduct of the tug's master and mate.
 
 
 140
 Bouchard, 583 F.Supp. at 482. We are faced with the same situation here, the findings of negligence by the district court went well beyond Pilot Lerro and established the fault of both the crew members and owners of the SUMMIT VENTURE. We further note that as to Pilot Lerro the proof of negligence was different at the state administrative level given the penal nature of the proceeding and the requirement of substantial evidence. See Bowling v. Department of Insurance, 394 So.2d 165, 171 (Fla. 1st Dist.Ct.App.1981).
 
 
 141
 The trial court is vested with broad discretion in deciding questions of fairness, and Hercules has not established that the district court abused its discretion in refusing to apply collateral estoppel in this case. See Parklane Hosiery Co. v. Shore, 439 U.S. 322, 331, 99 S.Ct. 645, 651, 58 L.Ed.2d 552 (1979). The equities of the present case support the district court's refusal to allow Hercules the benefit of collateral estoppel. For the above-stated reasons, we affirm the district court's denial of Hercules' motion to collaterally estop the State of Florida from relitigating the issue of negligence before the district court.
 
 III. Exoneration (No. 82-5733)
 
 142
 Before the trial on limitation, all the claimants moved for partial summary judgment against Hercules on the issue of exoneration. In order for Hercules to achieve complete exoneration under the Limitation of Liability Act it would have to prove that the accident was not attributable to the negligence of its crew or the pilot. Otherwise, Hercules is vicariously liable up to the amount of the value of the SUMMIT VENTURE for any negligence. The district court granted the motion on the ground that there was no genuine issue of fact as to whether Pilot Lerro was negligent, and therefore the claimants were entitled as a matter of law to prevent Hercules from attaining complete exoneration. Hercules appealed this order before the start of the limitation trial.
 
 
 143
 In light of our affirmance of the district court in Appeal No. 83-3242, we find it unnecessary to reach the petitioner's claim that summary judgment on the exoneration issue was improper--the question is now moot given the district court's finding that Hercules was not entitled to a limitation of liability, and our affirmance of that finding. Likewise, the petitioner's motion that the State of Florida be barred from benefiting from the grant of summary judgment on the exoneration issue because of the finding by one of its administrative tribunals that Pilot Lerro was not negligent is also moot given our affirmance of the district court in Appeal No. 83-3591.
 
 
 144
 Accordingly, the orders of the district court encompassing Appeal Nos. 82-5733, 83-3242 and 83-3591 are hereby AFFIRMED.
 
 
 
 *
 Honorable Seybourn H. Lynne, U.S. District Judge for the Northern District of Alabama, sitting by designation
 
 
 [1]
 The district court order was affirmed en banc by an equally divided court. In re Hercules Carriers, Inc. v. State of Florida, 728 F.2d 1359 (11th Cir.1984) (en banc), cert. denied, --- U.S. ----, 105 S.Ct. 128, 83 L.Ed.2d 69 (1984)
 
 
 [2]
 In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. Id. at 1209
 
 
 [3]
 As stated by this court in Farrell Lines:
 [W]e note that the determination of negligence overlaps the determination of unseaworthiness. Seaworthiness is defined as reasonable fitness to perform or do the work at hand.... The standard of reasonableness thus pervades both determinations.
 530 F.2d at 10 n. 2, citing Walker v. Harris, 335 F.2d 185 (5th Cir.) (emphasis in original), cert. denied, 379 U.S. 930, 85 S.Ct. 326, 13 L.Ed.2d 342 (1964).
 
 
 [4]
 Indeed, Congress in 1984 amended subsection (b) of 46 U.S.C. Sec. 183 to increase the minimum liability of the owner of a seagoing vessel from $60 per ton of such vessel's tonnage to $420 per ton. Section 183(b) now reads: "In the case of any seagoing vessel, if the amount of the owner's liability as limited under subsection (a) of this section is insufficient to pay all losses in full, and the portion of such amount applicable to the payment of losses in respect of loss of life or bodily injury is less than $420 per ton of such vessel's tonnage, such portion shall be increased to an amount equal to $420 per ton, to be available only for the payment of losses in respect of loss of life or bodily injury. If such portion so increased is insufficient to pay such losses in full, they shall be paid therefrom in proportion to their respective amounts."
 This recent amendment demonstrates that Congress has reconsidered the Limitation of Liability Act and found its original purpose to still be viable.
 
 
 [5]
 On the day of the accident, Pilot Evans was aboard the M/V Good Sailor which was headed outbound from Tampa Bay. Pilot Evans reduced the Good Sailor's speed to slow ahead at Buoy 10 to wait out the storm
 
 
 [6]
 The evidence introduced at trial indicated that Pilot Lerro did not see the Skyway Bridge until just prior to impact and Captain Liu first saw the bridge at impact. The lookouts first saw the silhouette of the bridge when the order came to let go both anchors. (TB 155, 687, 287, 297) ("TB" refers to the limitation trial transcript prepared by F.P. Bortle for October 12 to 18)
 
 
 [7]
 Article 16 of the Inland Rules has since been repealed and replaced by 33 U.S.C. Sec. 2006 which provides:
 Safe speed (Rule 6)
 Every vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions.
 In determining a safe speed the following factors shall be among those taken into account:
 (a) By all vessels:
 (i) the state of visibility;
 (ii) the traffic density including concentration of fishing vessels or any other vessels;
 (iii) the maneuverability of the vessel with special reference to stopping distance and turning ability in the prevailing conditions;
 (iv) at night the presence of background light such as from shore lights or from back scatter of her own lights;
 (v) the state of wind, sea, and current, and the proximity of navigational hazards;
 (vi) the draft in relation to the available depth of water.
 (b) Additionally, by vessels with operational radar:
 (i) the characteristics, efficiency and limitations of the radar equipment;
 (ii) any constraints imposed by the radar range scale in use;
 (iii) the effect on radar detection of the sea state, weather, and other sources of interference;
 (iv) the possibility that small vessels, ice and other floating objects may not be detected by radar at an adequate range;
 (v) the number, location, and movement of vessels detected by radar; and
 (vi) the more exact assessment of the visibility that may be possible when radar is used to determine the range of vessels or other objects in the vicinity.
 Pub.L. No. 96-591, Sec. 2 (Dec. 24, 1980).
 
 
 [8]
 Immediately upon arriving at the bow, the lookout reported sighting buoy 16; however, he was unable to identify its color or shape because of the poor visibility caused by the storm
 
 
 [9]
 TL refers to the Limitation Trial Transcript prepared by R.H. Lee for October 18 to 21
 
 
 [10]
 Company regulations under which the SUMMIT VENTURE operated, likewise, provided:
 The employment of a pilot, voluntary or compulsory does not absolve the master or his officers of their responsibility in the navigation of the vessel. Too often the common practice of seamen is waived as soon as the pilot embarks. This is wrong.
 
 
 [11]
 While Captain Liu was aware of the IMCO regulations, his actions aboard the SUMMIT VENTURE combined with his later testimony, conclusively demonstrated that the unofficial company policy of deference, not the IMCO regulations, is what he obeyed aboard the SUMMIT VENTURE
 
 
 [12]
 Second Mate Kong was asleep below deck at the time of the allision and therefore his lack of a valid license could not have any causal relation to the allision. Accordingly, we will focus on Chief Mate Chan and the relation of his invalid license to the allision
 
 
 [13]
 This court has identified three prerequisites to the application of collateral estoppel:
 (1) that the issue at stake be identical to the one involved in the prior litigation;
 (2) that the issue have been actually litigated in the prior litigation; and
 (3) that the determination of the issue in the prior litigation have been a critical and necessary part of the judgment in that earlier action.
 Deweese v. Town of Palm Beach, 688 F.2d 731, 733 (11th Cir.1982) (citations omitted). As detailed below Hercules' collateral estoppel claim fails under the first two tests because the limitation trial involved a different state agency that sought to establish not only the negligence of Pilot Lerro but also Hercules' crew members aboard the ship.
 
 
 [14]
 The Supreme Court has differentiated res judicata and collateral estoppel as follows:
 Under the doctrine of res judicata, a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action. Under the doctrine of collateral estoppel, on the other hand, the second action is upon a different cause of action and the judgment in the prior suit precludes relitigation of issues actually litigated and necessary to the outcome of the first action.
 Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979).
 
 
 [15]
 R.E. refers to Record Excerpts on appeal in Case No. 83-3591
 
 
 [16]
 As is clearly evidenced by the administrative complaint filed by the DPR, the only issue raised with respect to Pilot Lerro's negligence was his culpability from two-tenths of a mile outside buoys 1A and 2A, and onward:
 At approximately one mile west of Skyway Bridge in Tampa Bay, the weather conditions deteriorated to the point that Lerro had no visibility and no means by which to safely navigate beneath the Skyway Bridge. During this time, John Lerro made no effort to halt the way of the Motor Vessel Summit Venture or otherwise act prudently to avoid a collision.
 This court has previously held that when the scope of the administrative hearing is much narrower than a subsequent lawsuit, collateral estoppel will not be applied. Garner v. Giarrusso, 571 F.2d 1330, 1336 (5th Cir.1978). The issue in the administrative hearing was Lerro's competence to continue as a licensed pilot. The issue before the district court was whether Lerro was negligent from the time he took over the conn. Acts of negligence on a given occasion by a professional person do not necessarily require that his license be revoked.