In the Matter of the Complaint of AMERICAN DREDGING COMPANY As Owner of the Tug "Marco Island", Her Engines, Tackle, Appurtenances, etc., In a Cause of Exoneration from or Limitation of Liability.

No. 92–0340–CIV.

United States District Court, S.D. Florida.

April 21, 1994.

Theodore Livingston Shinkle, Keller, Houck & Shinkle, P.A., Mark Hicks, Hicks, Anderson & Blum, P.A., Miami, FL, for American Dredging Co.

Thomas E. Backmeyer, Hoppe, Backmeyer & Stokes, P.A., Miami, FL, for Jose Lambert.

Laurence F. Valle, Jeffrey C. Dahl, Nicklaus, Valle, Craig & Wicks, P.A., Miami, FL, Elizabeth Koebel Russo, Russo, Talisman & Moylan, P.A., Coconut Grove, FL, for Kim Pietruszka.

Michael Joseph Murphy, Gaebe, Murphy, Mullen, Antonelli & Berlin, Coral Gables, FL, for Mario Perez.

Richard W. Wasserman, Miami Beach, FL, for Zacharia S. Gispan.

Mark David Gilwit, Mark D. Gilwit, Miami, FL, for Juan Renteria.

### ORDER ON MOTIONS FOR SUMMARY JUDGMENT

EDWARD B. DAVIS, District Judge.

THIS MATTER is before the Court on Respondents/Claimants' Motions for Final Summary Judgment (D.Es. 179, 187, 188, 278, and 283). Also before the Court is the petitioner's Motion for Partial Summary Judgment on the issue of non-pecuniary damages (filed February 24, 1994). The petitioner, American Dredging Company, brought the present admiralty action in this Court seeking exoneration and limitation of liability pursuant to 46 U.S.C.App. § 183. The Court will deny that relief, and, for the reasons discussed below, will grant the claimants' motion for summary judgment on the exoneration and limitation of liability issue. As to the issue of non-pecuniary damages, the Court will deny the petitioner's motion.

### I. Background

This case arises from a fatal accident that occurred in Biscayne Bay in the early morning of November 23, 1991. At approximately 3:15 a.m., a 17 foot pleasure boat carrying four passengers ("claimants")[1] allided with a dredge pipeline operated by American Dredging Company ("American Dredging"). The four passengers were thrown from the pleasure boat, and three of them died as a result.

The petitioner, American Dredging, had contracted with Metropolitan Dade County to perform dredging activities south of Lummus Island. (See Depo. of Richard Mascio 14.) In the early morning of November 23, 1991, the dredge "American" was dredging with her face to the east, with up to one thousand feet of dredge pipeline extending to the west behind her and parallel to the shoreline of Lummus Island. (Claimant Kim Pietruszka's exhs. 4–6.) The "American" sat some 200 to 250 feet south of Lummus Island. (Depo. of Victor Rodriguez 30–33.) The dredge line, at its western end, made a right angle north so that it could deposit the dredged material onto Lummus Island. (Depo. of Rodriguez 73; Claimant Pietruszka's Exhs. 4–6.)

About thirty minutes prior to the accident, a barge and tug sought access to Lummus Island and the Port of Miami; however, the position of the dredge "American" and its dredge line were blocking the passage way. In order to provide access, the tug "Marco Island," which is owned by American Dredging, (Depo. of Richard Mascio 36), assisted

---

1. There are actually four plaintiffs in this case. The four passengers or their personal representatives are suing. Those aboard the pleasure boat at the time it allided with the dredge pipe were: Alejandro Lambert (the boat's pilot), Donald Pietruszka, Vivian Perez, and Juan Renteria. Renteria was the only survivor. Zacharia Gispan, the owner of the pleasure boat that was destroyed in the accident, also was a plaintiff in this case; however, he settled his claims with American Dredging and was dismissed from the case on April 21, 1994.

by another tug "Miss Nicie," which was leased by American Dredging, (Depo. of Mascio 36), opened the dredge line. More specifically, the "Marco Island" disconnected the dredge line at its eastern end and moved the line to the southeast, so that it stretched diagonally across part of the navigable channel. (*See* Depo. of Rodriguez 47–49.) While holding the dredge line open, the "Marco Island" was approximately 50 to 80 feet from the southern end of the channel. (Depo. of Rodriguez 47, 111.) Her bow faced the northwest. (*Id.*) Simultaneously, the "Miss Nicie" pushed the western portion of the opened dredge line toward the Lummus Island/Port of Miami shoreline. (*See* Depo. of Rodriguez 27–28). The barge and tug then had access to pass through the opening in the dredge line and dock to the north.

With the dredge line opened in this manner, the small pleasure boat carrying the claimants entered the channel from the west, traveling east at approximately 30 m.p.h. The boat's pilot, Alejandro Lambert ("Lambert"), had a blood alcohol level of .22. The pleasure boat struck the dredge line about one hundred feet northeast of the "Marco Island," sinking the pleasure boat and throwing its passengers into the water. (*See* Depo. of Rodriguez 110.)

Marine Patrol Officer Vincent Peterson ("Peterson") arrived on the scene approximately five minutes after the accident, and he called for additional officers who arrived at approximately 4:40 a.m. As Peterson arrived, the lone survivor, Juan Renteria ("Renteria"), was being pulled from the water.

The opening of the dredge line by the "Marco Island" blocked at least part of Fisherman's Channel, i.e., the channel that is south of Lummus Island.[2] To the south of Fisherman's Channel are shallow areas, or flats. American Dredging has submitted evidence that 155 feet of navigable channel was

passable between the stern of the tug "Marco Island" and the southern edge of the channel, (Robert K. Taylor Aff. 2.), and although the evidence does not clearly identify that 155 feet of navigable channel was passable to the south of the "Marco Island," it does suggest that part of the channel was passable to the south.

The plaintiffs have presented evidence that the dredge line was not lighted in the manner required by statute, and American Dredging has not contradicted the factual evidence regarding the number and location of the lights on the dredge lines. No red lights were placed on at least one end of the open dredge line. Also, American Dredging had placed some yellow battery-operated lights on the dredge line; however, they were set only every one hundred feet along the pipe.[3] (Depo. of Rodriguez 53.) Further, unrefuted evidence establishes that the yellow lights that were on the dredge line were too dim to meet statutory standards. Denise Warrick ("Warrick"), one of the officers who arrived around 4:40 a.m., and Peterson also observed people walking onto the dredge pipe after the accident and starting to place lights on it. (Depo. of Warrick 19, 24; Depo. of Peterson 43–44.) Bright lights emanated from the dredge "American" itself, as well as from the tug "Marco Island." (Depo. of Rodriguez 131–33.)

Richard Mascio ("Mascio") was American Dredging's Superintendent for the Port of Miami dredging operation. (Depo. of Mascio 14.) He was responsible for, among other things, inspection and maintenance of the dredge and all equipment, including dredge pipes and lights. (Depo. of Mascio 21, 39.) Jim Gilli was Mascio's immediate supervisor and the overall project superintendent. (*See* Depo. of Mascio 33–34.) He had an office at the Port of Miami and often was at the dredging site two or three times a day. (*Id.*)

---

2. American Dredging argues that the dredge pipe was not blocking the channel, (*see* Response Brief 2; Aff. of Taylor 3), apparently attempting to create a fact issue and preclude the application of the lighting regulations against it. The argument is without merit: the dredge line obviously blocked at least part of the channel or the pleasure boat would not have hit it.

3. Although American Dredging contends that it did have appropriate lighting as required by regulation, (John A. Cartner Aff. 4), it admits that it did not have flashing lights every ten meters.

## II. Standard of Review

A party seeking summary judgment bears the burden of demonstrating that no genuine dispute as to any material fact exists, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Mercantile Bank & Trust Co., Ltd. v. Fidelity & Deposit Co.,* 750 F.2d 838, 841 (11th Cir.1985), and all reasonable doubts as to the facts are to be resolved in favor of the party opposing summary judgment. *Mercantile Bank & Trust Co.,* 750 F.2d at 841. While the burden on a party seeking summary judgment is great, the opposing party has a duty to present affirmative evidence in order to defeat a properly supported motion for summary judgment. *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

## III. Discussion

### A. Exoneration and Limitation of Liability

■ The first legal issue before the Court is whether American Dredging is entitled to exoneration or limitation of liability under 46 U.S.C.App. § 183. Section 183(a) of Title 46 provides:

> The liability of the owner of any vessel . . . for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not . . . exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.

In short, the Act permits the owner of a vessel to limit his liability for the damage caused by a collision if the conditions or circumstances that caused the collision were outside of his knowledge or privity. *Petition of M/V Sunshine, II,* 808 F.2d 762, 763 (11th Cir.1987).

■ The determination as to whether a shipowner is entitled to limitation of liability is a two step process.[4] First, the Court must consider what acts of negligence or conditions of unseaworthiness caused the accident, and it is the claimants' burden to prove negligence or unseaworthiness. *See Hercules Carriers, Inc. v. State of Florida,* 768 F.2d 1558, 1563–64 (11th Cir.1985). If the claimants show negligence or unseaworthiness, then the burden shifts to American Dredging to show lack of privity or knowledge of the circumstances or conditions that caused the collision. *See Hercules,* 768 F.2d at 1563–64.

In this particular case, the Court first will consider whether American Dredging was negligent, i.e., whether it breached a duty to the claimants, including whether American Dredging's breach of duty was the sole or a contributing cause of the allision. Then, it will determine whether American Dredging had knowledge of the negligent acts that caused the damage to the claimants.

#### 1. Negligence/Breach of Duty and Causation

■ With regard to American Dredging's alleged negligence, the claimants argue that, as a matter of law, American Dredging breached a duty owed to them. American Dredging, however, contends that the question of negligence is a fact issue that must be determined by the jury. While it is true that negligence generally is a fact question for the jury's determination, *see, e.g., Randolph v. Laeisz,* 896 F.2d 964, 971 (5th Cir.1990), the uncontroverted facts of this case dictate that American Dredging was negligent as a matter of law. This Court reaches this conclusion because it is clear that American Dredging violated statutory regulations that were designed to prevent the type of accident that occurred in this case.

Section 88.15 of Title 33 to the Code of Federal Regulations, which is a part of the Inland Navigational Rules of Title 33 of the United States Code, states:

> Dredge pipelines that are floating or supported on trestles shall display the following lights at night and in periods of restricted visibility.

---

4. The plaintiffs argue that American Dredging is not entitled to exoneration because exoneration is available only if American Dredging was not guilty of any contributory fault that caused the accident. *See Tittle v. Aldacosta,* 544 F.2d 752, 755 (5th Cir.1977). The Court agrees, and American Dredging makes no significant attempt to argue this issue in its response to the claimants' motion for summary judgment.

(a) One row of yellow lights. The lights must be—

(1) Flashing 50 to 70 times per minute,

(2) Visible all around the horizon,

(3) Visible for at least 2 miles on a clear dark night,

(4) Not less than 1 and not more than 3.5 meters above the water,

(5) Approximately equally spaced, and

(6) Not more than 10 meters apart where the pipeline crosses a navigable channel. Where the pipeline does not cross a navigable channel the lights must be sufficient in number to clearly show the pipeline's length and course.

(b) Two red lights at each end of the pipeline, including the ends in a channel where the pipeline is separated to allow vessels to pass (whether open or closed). The lights must be—

(1) Visible all around the horizon, and

(2) Visible for at least 2 miles on a clear dark night, and

(3) One meter apart in a vertical line with the lower light at the same height above the water as the flashing yellow light.

The uncontroverted facts of this case establish that American Dredging did not comply with this regulation.

With regard to subsection (b), American Dredging does not even attempt to argue that it properly placed red lights on the end of the open dredge line. Rather, it declares that the lights on the tug "Marco Island" superseded the need for the red lights. This unsubstantiated interpretation of the regulation as allowing the substitution of tug lights for red lights is flawed. The purpose of the regulation is obvious: the red lights are required, along with the yellow lights, to identify the path of the dredge pipe and notify boat pilots of the location of the dredge line. American Dredging did not comply with the straightforward and simple requirements of subsection (b) of the regulation.

Also, with regard subsection (a) of the regulation, American Dredging admits that yellow lights were placed only every one hundred feet on the dredge line, rather than every 10 meters as the regulation requires. Further, the claimants produced evidence, unrefuted by American Dredging, that two patrol officers observed employees of American Dredging attempting to place yellow lights on the dredge pipeline after the accident. This testimony is further evidence of American Dredging's noncompliance with the regulation.

Finally, the claimants also submit evidence that the few yellow lights that American Dredging did have on the pipeline were too dim to comply with the regulation. In light of this cumulative evidence of American Dredging's noncompliance, the Court concludes that American Dredging violated 33 C.F.R. § 88.15.

Part of the negligence analysis is the issue of causation. That is, as the Eleventh Circuit has said, "[t]o produce liability, the acts of negligence or conditions of unseaworthiness must be a contributory and proximate cause of the accident." [5] *Hercules,* 768 F.2d at 1566. American Dredging argues that the pleasure boat operator's intoxication was the sole cause of the accident. However, the claimants urge that American Dredging's negligence, at the very least, contributed to the accident, that the rule of *The Pennsylvania* shifts the burden of proof on the negligence issue to American Dredging, and that American Dredging cannot carry that burden. The Court agrees with the claimants.

■ In *The Pennsylvania,* 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874), the Supreme Court held that when a ship is involved in a collision and that ship is in violation of a statutory rule that was designed to prevent collisions, the burden shifts to that ship to prove that its statutory violation was not a contributing cause of the collision. *See, e.g., Self v. Great Lakes Dredge & Dock Co.,* 832 F.2d 1540, 1554 (11th Cir.1987); *Candies*

---

**5.** Under 46 U.S.C.App. § 183, either negligence or unseaworthiness can be a basis for denying petitioners limited liability. While the claimants seem to bring forth arguments with regard to the unseaworthiness of the "American," the Court need not examine this issue as American Dredging's non-compliance with 33 C.F.R. § 88.15 is enough to prove that it was negligent, thereby disposing of the need for the Court to determine seaworthiness or unseaworthiness.

*Towing Co, Inc. v. M/V B & C Eserman,* 673 F.2d 91, 93 (5th Cir.1982). That is, when a ship is in violation of a statutory rule, there is a presumption that the ship's violation was at least a contributing cause of the accident. *See Self,* 832 F.2d at 1554. Hence, American Dredging has the burden "of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been." *See id.*

This burden, in this case, is too much to overcome. American Dredging has not convinced the Court nor produced evidence to show that its breach of the regulation (that is, its negligence) "could not have been" one of the causes of the accident. While American Dredging argues that the pleasure boat pilot's "toxic" intoxication was the sole cause of the accident, it does not adequately explain how the lack of proper lighting *could not have been* a contributing cause.

### 2. Knowledge or Privity

■■■ Having found that the claimants established negligence, including causation, the Court must consider whether American Dredging had knowledge or privity of the negligent acts. That is, 46 U.S.C.App. § 183(a) allows limited liability only if the shipowner had no knowledge or privity of the specific acts that caused the accident. *See Hercules,* 768 F.2d at 1574. Further, when the petitioner shipowner is a corporation, privity or knowledge means the privity or knowledge of a managing agent, officer, or supervisory employee. *See id.* Once the claimants have established negligence and causation, American Dredging has the burden to show lack of privity or knowledge. *See Sunshine, II,* 808 F.2d at 763; *Hercules,* 768 F.2d at 1564.

■■■ Privity or knowledge can be personal participation by the owner in the negligence, *see Sunshine, II,* 808 F.2d at 763, but it also can be less than actual knowledge. That is, knowledge or privity also exists when the owner "could have and should have obtained the information [concerning the negligent acts] by reasonable inquiry or inspection." *Hercules,* 768 F.2d at 1577; *see also, e.g., Brister v. A.W.I., Inc.,* 946 F.2d 350, 357 (5th Cir.1991) (ruling that the corporate shipowner "must overcome a presumption not only that its officers and managers had actual knowledge, but also that they should have known of the unseaworthy or negligent condition that caused the injury"); *Complaint of Patton–Tully Transp. Co.,* 797 F.2d 206, 211 (5th Cir.1986) (ruling that the question with regard to corporate owners "is not what the corporation's officers and managers *actually* knew, but what they objectively *ought* to have known").

American Dredging cannot carry the burden of showing that it had no knowledge or privity in this case. Supervisory personnel had offices near the dredging site and visited the site often. Even if management did not have actual knowledge of the statutory violations, it should have obtained that knowledge. American Dredging practically concedes this point as it only summarily argues this issue in its response brief. The Court finds that, for purposes of 46 U.S.C.App. § 183, American Dredging had knowledge of the negligent acts. Given that American Dredging, as a matter of law, cannot meet the requirements of 46 U.S.C.App. § 183, the Court will grant the claimants' motion for summary judgment as to the exoneration and limitation of liability issue.

### B. Non–Pecuniary Damages

American Dredging, in its Motion for Partial Summary Judgment, argues that the claimants Mario Perez, Jose Lambert, and Kim D. Pietruszka, should not be allowed to recover non-pecuniary damages in their wrongful death actions. These three claimants assert their claims on behalf of Vivian Perez, Alejandro Lambert, and Donald R. Pietruszka, respectively, all of whom were killed as a result of the accident. American Dredging generally defines non-pecuniary damages as those damages that relate to loss of society. As the Supreme Court said in *Sea Land Services, Inc. v. Gaudet,* "[t]he term 'society' embraces a broad range of mutual benefits each family member receives from the others' continued existence, including love, affection, care, attention, companionship, comfort, and protection." 414 U.S. 573, 585, 94 S.Ct. 806, 815, 39 L.Ed.2d 9 (1974).

 The law governing this issue has an interesting history. As a starting point, the Court will consider two statutes that have bearing on the precise issue in this case. The Death on the High Seas Act ("DOHSA"), 46 U.S.C. §§ 761–767 (1975 & 1994), creates a wrongful death cause of action for a representative of *anyone* killed on the high seas (i.e., more than three miles from shore). *Miles v. Apex Marine Corp.*, 498 U.S. 19, 24, 111 S.Ct. 317, 321, 112 L.Ed.2d 275 (1990). DOHSA does not distinguish between legal theories under which a claimant might sue. That is, a claimant can bring a cause of action based on either negligence or unseaworthiness under DOHSA. *See id.* However, DOHSA does not apply to deaths occurring in state territorial waters. *See, e.g., Truehart v. Blandon*, 672 F.Supp. 929, 935 (E.D.La.1987).

 The Jones Act, 46 U.S.C.App. § 688 (Supp.1994), creates a wrongful death action *grounded in negligence* for a personal representative of a *seaman* who died in the course of employment. *Miles*, 498 U.S. at 23–24, 111 S.Ct. at 321. It does not create a cause of action for the deaths of non-seamen nor for suits brought under theories other than negligence. *See Miller v. American President Lines, Inc.*, 989 F.2d 1450, 1455–56 (6th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 304, 126 L.Ed.2d 252 (1993); *Truehart*, 672 F.Supp. at 935. The Jones Act has been interpreted to limit a claimant's recovery to pecuniary damages, *see Miles*, 498 U.S. at 32, 111 S.Ct. at 325, while DOHSA expressly does the same. *See* 46 U.S.C.App. § 762.

The three individuals in this case who died in the accident were in territorial waters, not on the high seas. Also, the parties to the case do not dispute the fact that all three individuals were non-seamen. Hence, neither DOHSA nor the Jones Act applies, and American Dredging, therefore, cannot escape liability for non-pecuniary damages by the direct application of either of these statutes.

 However, the Jones Act and DOHSA, because they do not apply to all

situations in which people are killed at sea,[6] *see Miller*, 989 F.2d at 1455, are not the only law governing admiralty wrongful death causes of action. Prior to 1970, no general, common law, admiralty right of action for wrongful death existed, although the Supreme Court had ruled in 1886 in *The Harrisburg* that wrongful death recovery for deaths occurring in territorial waters could be had under state wrongful death statutes. 119 U.S. 199, 213, 7 S.Ct. 140, 146, 30 L.Ed. 358 (1886); *see also Wahlstrom v. Kawasaki Heavy Industries, Ltd.*, 4 F.3d 1084, 1088 (2nd Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1060, 127 L.Ed.2d 380 (1994) (explaining the history). Hence, in 1970, the Supreme Court, in *Moragne v. States Marine Lines, Inc.*, created a general admiralty cause of action for wrongful death claimants and expressly overruled *The Harrisburg* which had precluded the general, federal cause of action. 398 U.S. 375, 409, 90 S.Ct. 1772, 1792, 26 L.Ed.2d 339 (1970); *see Miller*, 989 F.2d at 1455–56. *Moragne* actions, by being general in nature, apply to deaths in territorial waters (to which DOHSA, which applies to occurrences on the high seas only, does not apply) of non-seamen (to which the Jones Act, which applies to seamen only, does not apply). *See, e.g., Matter of S.S. Helena*, 529 F.2d 744, 753 (5th Cir.1976); *see also Miller*, 989 F.2d at 1456 (observing that *Moragne* involved a longshoreman killed in territorial waters; that his death was caused by the unseaworthiness of the ship (rather than negligence); that since he was not a seaman the Jones Act did not create a cause of action for him; and that since the accident occurred in territorial waters (rather than on the high seas), DOHSA did not provide him with a cause of action). It is under *Moragne* that the claimants in this case have a cause of action, and neither party disputes that fact.

As to the amount of damages allowable in *Moragne* wrongful death cases, the Supreme Court left that question open for "further sifting through the lower courts in future

---

**6.** Neither DOHSA nor the Jones Act apply to wrongful death actions brought on behalf of non-seamen who die in territorial waters. *See Miller,* 989 F.2d at 1455. In addition, neither act ap-

plies to a wrongful death action on behalf of a seaman who dies in territorial waters and whose death was caused by a vessel's unseaworthiness rather than a person's negligence.

litigation," noting that lower courts could look to both DOHSA and state wrongful death statutes for guidance as both "have been implemented with success for decades." *Moragne*, 398 U.S. at 408, 90 S.Ct. at 1792. As to the specific issue in this case, i.e., the recovery of non-pecuniary damages, DOHSA disallows recovery for non-pecuniary damages while the overwhelming majority of state wrongful death statutes allow recovery.[7]

■ Within this context, this Court now turns to the issue of whether a claimant who brings a *Moragne* cause of action on behalf of a non-seaman decedent who was killed in territorial waters is limited to a recovery of pecuniary damages. The Supreme Court has not ruled on this precise issue; however, this District allows the recovery of non-pecuniary damages in fact situations like this one, as long as the claimant was a dependent of the decedent.

In *Cantore v. Blue Lagoon Water Sports, Inc.*, the parents of a non-seaman 24–year-old college student who died in territorial waters sought recovery of non-pecuniary damages. 799 F.Supp. 1151 (S.D.Fla.1992). Neither DOHSA (because the accident occurred in territorial waters, not on the high seas) nor the Jones Act (because the decedent was a non-seaman) applied. The *Cantore* Court considered the very arguments that American Dredging makes in this case: (1) that the Jones Act, which applies to seamen, does not allow seamen to recover non-pecuniary damages and that maritime law historically is more generous to seamen than to any other group, and therefore non-seamen should be denied recovery of non-pecuniary damages; and (2) that uniformity is an

aim of admiralty law, and both DOHSA and the Jones Act preclude recovery for non-pecuniary damages, and therefore the claimants in this *Moragne* cause of action should be denied such a recovery. *See id.* However, the *Cantore* Court's consideration of these arguments was in somewhat of a different context than the context of this case: the *Cantore* Court sought to decide whether non-dependents should be allowed to recover non-pecuniary damages, and it held that dependents could recover. By contrast, in this case, this Court must determine whether anyone, regardless of whether they are a dependent or a nondependent, can recover non-pecuniary damages.

The *Cantore* Court ultimately denied the petitioner's motion for summary judgment and ruled that it would not preclude non-pecuniary damages as a matter of law because it could not determine whether the claimant was a dependent of the decedent. *See id.* at 1155. Hence, although its context differed slightly from that of this case, the *Cantore* Court clearly articulated the rule that dependents of non-seamen decedents who die in territorial waters are allowed to recover non-pecuniary damages in *Moragne* causes of action.[8] *See id.* at 1155 & n. 3.

Other courts seem to recognize the same rule. The Second Circuit implicitly recognized that dependents of non-seamen killed in territorial waters can recover non-pecuniary damages when it expressly ruled that nondependents have no similar right of recovery. *See Wahlstrom*, 4 F.3d at 1092 (saying that arguably a "pecuniary standard such as dependency should not provide the dividing line on this issue" but that "countervailing concerns nonetheless outweigh the force of this contention").[9] Further, in *Truehart v.*

---

7. *Moragne* itself precludes the recognition in admiralty law of state statutory wrongful death causes of action. *See, e.g., Helena*, 529 F.2d at 752; *Neal v. McGinnis, Inc.*, 716 F.Supp. 996, 1000 (E.D.Ky.1989).

8. It appears to be an almost universal rule that non-dependent claimants cannot recover non-pecuniary damages. *See Wahlstrom v. Kawasaki Heavy Industries, Ltd.*, 4 F.3d at 1091–92 (listing cases which stand for that proposition).

9. Interestingly, the Second Circuit, in *Wahlstrom*, cited the Fifth Circuit case *Walker v. Braus*,

995 F.2d 77, 82 (5th Cir.1993), for the proposition that a widow (i.e., a dependent) of a non-seaman who was killed in territorial waters cannot recover for loss of consortium (i.e., a portion of loss of society damages) because of the Supreme Court's 1990 ruling in *Miles v. Apex Marine Corp.*, 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990). However, in *Braus*, the Fifth Circuit did not expressly announce that holding but insinuated that strong arguments militated in favor of that holding if the particular issue came before it. The Second Circuit had the opportunity to write similar dictum in the *Wahlstrom* opinion, especially in light of the fact

*Blandon,*[10] the Eastern District of Louisiana recognized that "only dependents should be permitted to recover for loss of society," and that

> somewhere a line must be drawn between those who may recover for loss of society and those who may not. The line suggested in Supreme Court and Fifth Circuit opinions, the line between dependents and nondependents, appears to be the most rational, efficient and fair.[11]

672 F.Supp. at 937–38.

However, this Court must consider closely the extent to which the Supreme Court's 1990 decision in *Miles v. Apex Marine Corp.* alters the rule that *Moragne* cause of action claimants can recover non-pecuniary damages if they were dependents of the decedent. In *Miles,* the Supreme Court precluded recovery for non-pecuniary damages when the claimant (1) of a decedent who was a seaman (2) brought a *Moragne* cause of action (3) that was based on the unseaworthiness legal theory. *Miles* may indicate that the Supreme Court is cutting away at non-pecuniary recoveries as it obviously intrudes on *some Moragne* causes of action.[12] However, the only portion of *Moragne* causes of action that *Miles* explicitly reaches is cases in which a seaman was the decedent and in which the claimants seek recovery under an unseaworthiness legal theory.

Further, the decision in *Miles* arguably was a foregone conclusion at the point in which courts interpreted the Jones Act to disallow the recovery of non-pecuniary damages. That is, the Jones Act only allows claimants of deceased seamen to recover and only under a negligence legal theory. However, claimants of deceased seamen can sue for wrongful death under an unseaworthiness legal theory in a *Moragne* cause of action. Thus, arguably, the *Miles* Court would have defied the Jones Act by allowing the *Moragne* claimants of the deceased seaman to recover non-pecuniary damages when no such recovery was available under the Jones Act where the negligence theory was used.[13] *Cf. Cantore,* 799 F.Supp. at 1153 (saying, "in a case such as *Miles,* the Court is restricted in its award of damages by the Congressional intent expressed in statutes. Allowing recovery beyond what is permitted in the statutes would be to expand recovery beyond what Congress intended. However, the instant case is distinguishable in that the Plaintiff could not have had recovery under either the Jones Act or DOHSA. Thus, it could be argued, the Plaintiff should not be limited to

that it seemed to recognize the rule that dependents can recover loss of society damages in a wrongful death action on behalf of a non-seaman who died in territorial waters. Although this Court does not regard the Second Circuit's failure in *Wahlstrom* to write dictum similar to the Fifth Circuit's dictum in *Braus* as determinative of the present issue it faces, it does find the Second Circuit's *Wahlstrom* opinion to be favorable to its holding, especially because of its language recognizing that dependency is the dividing line for loss of society damages. *See Wahlstrom,* 4 F.3d at 1092.

**10.** *Truehart* was decided before *Miles v. Apex Marine Corp.,* 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990), and the Court, therefore, cites it with caution. Even so, it is instructive.

**11.** In *Truehart,* the Eastern District of Louisiana also found that allowing dependents of deceased who died in territorial waters to recover nonpecuniary damages did not create a great threat to uniformity in admiralty. 672 F.Supp. at 934 (analyzing and relying upon the Supreme Court's decision in *Mobile Oil Corp. v. Higginbotham,* 436 U.S. 618, 624 & n. 20, 98 S.Ct. 2010, 2014 & n. 20, 56 L.Ed.2d 581 (1978), for this proposi-

tion). It concluded that loss of society damages would threaten uniformity only if they became the sole or a vast portion of the damages sought by wrongful death claimants. *Id.; see also Anderson v. Whittaker Corp.,* 692 F.Supp. 764, 772–73 (W.D.Mich.1988), *aff'd in part and rev'd in part on other grounds,* 894 F.2d 804 (6th Cir.1990), (indicating that loss of society damages for dependents of decedents should not become the "tail wagging the dog").

**12.** The *Cantore* Court said that *Miles* "evinces the Supreme Court's intent to limit *Gaudet* [allowing recovery for non-pecuniary damages] while expanding the *Miles* analysis [denying recovery for non-pecuniary damages]." 799 F.Supp. at 1155.

**13.** The other side of the coin, of course, is that Congress would extend the Jones Act to cover unseaworthiness claims if it so desired, thereby precluding seamen from recovering non-pecuniary damages in all cases involving seamen and that Congress's failure to extend the Jones Act to unseaworthiness claims is indicative of an intent to allow recovery of non-pecuniary damages in cases where claimants of deceased seamen sue under the unseaworthiness legal theory in *Moragne* causes of action.

only those damages allowed in the statutes"); *Mussa v. Cleveland Tankers*, 802 F.Supp. 84, 86 (E.D.Mich.1992) (saying "*Miles* was decided in the context of a Jones Act seaman (via his parent) suing his employer under the Jones Act for negligence and under general maritime law for unseaworthiness. In the context of its announced policy of uniformity in *related actions under statutory and case-developed maritime law,* the Court's ruling in *Miles* is compelled. Simply put, under the *Miles* Court's view, there should be no reason why a Jones Act seaman, unable to sue his employer for nonpecuniary damages directly under a Jones Act negligence claim, could sue his employer for such damages under a related general maritime law claim for unseaworthiness") (emphasis added). The Eastern District of Michigan's comparison of its factual situation in *Mussa* to the *Miles* factual situation is equally applicable to the case presently before this Court: "no situation is presented where statutory law provides a remedy different than the remedy provided under general maritime law, unlike the situation in *Miles.* As such, *Miles* does not control the instant actions as to [the claimants' claims]." 802 F.Supp. at 86.

In *Miles*, the Supreme Court concluded that it had restored uniformity "to all actions for the wrongful death of *a seaman,* whether under DOHSA, the Jones Act, or general maritime law." 498 U.S. at 33, 111 S.Ct. at 326 (emphasis added). In other words, *seamen* cannot recover non-pecuniary damages, regardless of where the accident occurred or under what legal theory the action is brought.[14] *Miles* does not explicitly apply to this case where the decedents were non-seamen, and this Court, therefore, is not willing to preclude the recovery of non-pecuniary damages. *Cf. Mussa*, 802 F.Supp. at 86 (refusing to extend *Miles* in a related but distinguishable context even though extending *Miles* would have created more uniformity). In addition, Congress, if it desired, could extend DOHSA to cover deaths that occur in territorial waters, thereby further limiting recovery for non-pecuniary damages and creating further uniformity in admiralty law.[15] However, it has not seen fit to do so.[16]

This Court agrees with the reasoning of the Southern District of West Virginia, which recently decided a case similar, yet not identical, to this case. It said: "It is inconsistent with federal maritime law to prohibit damages ... when there is no explicit statutory or federal common law prohibition on such damages. A tortfeasor should bear the total cost of the victim's death...." *Garner v. Dravo Basic Materials Co.*, 768 F.Supp. 192, 195 (S.D.W.Va.1991) (allowing claimants of a non-seaman decedent who died in territorial waters to recover lost future income). This Court, rather than belabor an analysis of uniformity in admiralty and admiralty's favorable treatment of seamen as its wards, will adopt the express holding of the Southern District of Florida in *Cantore* and allow claimants who were dependents of the non-seamen decedents to recover non-pecuniary damages. Simply put, no federal statute nor common law precedent precludes this recovery, and the Court will allow the claimants to be made whole.[17]

14. For thorough, well-reasoned discussions of *Miles* and its effect on the law in this area, see *Smallwood v. American Trading & Transp. Co.*, 839 F.Supp. 1377, 1382–87 (N.D.Cal.1993) and *Mussa v. Cleveland Tankers*, 802 F.Supp. 84 (E.D.Mich.1992).

15. The *Miles* Court noted that "Congress did not extend DOHSA to territorial waters because it believed state statutes sufficient in those areas." 498 U.S. at 25, 111 S.Ct. at 321. DOHSA originally was enacted in 1920 at a time when state wrongful death statutes, not *Moragne*, were the basis of wrongful death causes of action for deaths that occurred in territorial waters.

16. Policy reasons may exist for allowing claimants of non-seamen to recover non-pecuniary damages even though claimants representing seamen killed in the course of employment are not allowed to recover non-pecuniary damages. In short, there may be good reason to avoid uniformity in damages in this particular case; however, the parties did not thoroughly address these policy considerations in their briefs.

17. American Dredging argues: "The scope of applicable remedies was never intended to hinge on decedents' employment status, or in the case of non seamen, on the site of the accident. Such a result would fly in the face of *Moragne* and *Miles*" (Memo. in Support of Mot. for Summ. Judg. 7.) *See generally Miller,* 989 F.2d at 1457–58 (expressing a need for uniformity with regard to awards of punitive damages in admiralty wrongful death actions). This argument obviously has some merit and should be considered

Therefore, the Court will deny American Dredging's summary judgment motion on the issue of precluding non-pecuniary damages because there has been no presentation of evidence that, as a matter of law, the claimants seeking recovery for non-pecuniary damages are not dependents of the decedents. Accordingly, it is

ORDERED AND ADJUDGED that the claimants' motion for summary judgment on the issues of exoneration and limitation of liability is GRANTED. It is further

ORDERED AND ADJUDGED that the claimants' motions for oral argument on their motion for summary judgment (D.Es. 180, 189, 197 and 194) are DENIED. Finally, it is

ORDERED AND ADJUDGED that American Dredging's Motion for Summary Judgment on the issue of non-pecuniary damages (D.E. 268) is DENIED.

DONE AND ORDERED.

seriously; even so, this Court is not willing to preclude a complete remedy when no statute or case precedent specifically requires preclusion. If uniformity is indeed the overriding goal that must dictate the result in this particular case, this Court will leave that announcement to Congress or a higher court.